DECEMBER.        Dorsey vs. Dorsey's Heirs and Ex'rs. et al.

On a bill filed in chancery by E H D, to vacate a sale made of his lands when he was a minor, by E D, a trustee appointed under a decree of the court of chancery, which were, it was alleged, purchased by S G, for the use of E D, the trustee, and to annul the deeds executed in consequence of that sale—Held, that there being sufficient evidence to prove that S G did purchase the lands in question for E D, the trustee; and on the established principle, that a trustee can never be a purchaser at his own sale, the deeds made in consequence thereof be vacated, there being no evidence that E H D, the only person interested ever assented to the purchase; and that E H D pay to E D the amount paid by him for the purchase of the lands, &c.

The testimony of a witness as to the contents of a letter, who had never seen the person write who wrote the letter, and had no knowledge of his hand writing is inadmissible.

The declarations of a man respecting his title to lands made before he parts with his estate therein, are evidence against him, and all claiming under him.

Where it seemed to be unnecessary that the legatees should be made parties to a bill filed against the heirs and executors of the testator.

It seems not to be necessary on a bill filed to set aside a sale made by a trustee, to make the representatives of the person, who purchased at such sale for the benefit of the trustee, parties to the suit

APPEAL from a decree of the Court of Chancery. A bill was filed on the 21st of December 1800, by Edward H. Dorsey the appellant, against the heirs and executors of Edward Dorsey, the executors of Caleb Dorsey, and Samuel Godman. It stated, that Caleb Dorsey, possessed of a large landed and personal estate, by his will dated the 14th of March 1772, gave the following legacies to his daughters, viz. Rebecca Ridgely £1000 sterling, Mary Pue £1500 sterling, Milcah Dorsey £2000 sterling, Eleanor Dorsey £2000 sterling, Peggy L. Dorsey £2000 sterling, Priscilla Dorsey £1000 sterling, and to his grand daughter Eliza G. Dorsey £500 sterling. amounting in the whole to £10,000 sterling; and after several specific legacies, he gave the remainder of his personal property to his sons Samuel and Edward. His real estate he devised in tail, viz. to his son Samuel the following lands: Chew's Resolution Manor Resurveyed, The Gore, Chew's Vineyard, one undivided moiety of Taylor's Forest, and all the remaining unsold part of The Mill Frog, Timber Ridge, Caleb's Delight Enlarged, all his lots at Elk Ridge Landing, and all his part of the furnace and works at Curtis's creek, together with the land purchased and taken up for the use of the said furnace and works. To his son Edward, also in tail, Caleb's Pasture, The Valley of Owings, Littleworth, Caleb's and Edward's Friendship, and one undivided

moiety of *Taylor's Forest*, and all his part of the *Elk Ridge* furnace. In aid of the personal estate, and to discharge the legacies, and to leave personal property sufficient to carry on the *Elk-Ridge Furnace* and *Dorsey's Forge*, he directed that *Dorsey' Delight Enlarged*, *Timber Ridge*, *Mill Frog*, and also all his part of the furnace and works at *Curtis's* creek, together with all the other lands taken up and purchased for the use of the same, should be sold. The lands here mentioned are part of the lands devised to *Samuel*. Subsequent to the date of the will, and prior to the codicil, the testator purchased from *Alexander Lawson* his interest in the *furnace and works at Curtis's creek*; and thereby contracted a considerable debt, of which £3000 sterling were due at the testator's death, with interest from the 20th of May 1772. On the 21st May 1772, by a codicil, he devised the property purchased from *Lawson* to his sons *Samuel* and *Edward*, equally, the money due on the purchase to be paid by them equally. He also gave, by the codicil, the following legacies: To his daughters *Rebecca Ridgely*, *Mary Pue*, *Milcah Dorsey*, *Eleanor Dorsey*, *Peggy H. Dorsey*, and *Priscilla Dorsey*, each £600 sterling. The legacies to bear interest, and to be paid equally by his sons in three years. For the payment of the codicil legacies, he expressly makes the whole property devised to his sons liable, and explicitly declares, that the will legacies shall not be affected, but are to remain in the same situation as if the codicil had not been made. The amount of the will legacies, £10,000 sterling, or

£16,666 13 4

Amount of the codicil legacies
£3,600 sterling, or                            6,000  0 0

                              Currency   £22,666 13 4

The amount of the inventory
returned on the 27th of July
1779,                                          £10,479 10 0
List of sperate debts returned
the 23d of April, 1795,                           608 12 0
Old current money add ¼                         2,619  0 2
                                                ───────────── 13,708  0 2
24th of November 1789, credits allowed,                1,153 16 8¼

1818.        23d of April 1795,        786    0  1¾

Dorsey                                    ————————  1.939  16  5
vs
Dorsey                                    —————————————————

                                          11,768   3   9

                Deficient for the legacies,        £10,898   8  7

On the 16th of October 1778. on the application of *Ridge-ly* and wife, *Pue* and wife, *Goodwin* and wife, *Buchanan* and wife, *Samuel* and *Eleanor Dorsey*, to the legislature, a law passed, authorising the persons above named, or the survivors, to sell the whole of the *Curtis's Creek Works*, and that one sixth of the money arising from the sale should be paid to the guardian of *Edward Dorsey*, (then a minor,) to be applied as the personal estate, and the residue to the discharge of the will legacies. The lands were sold, including those purchased from *Lawson*; and the money applied to pay the legacies. leaving *Lawson's* debt due. *Lawson* brought a suit against the executors of *Caleb Dorsey*, and at August term 1783, obtained judgment. In 1774 *Samuel Dorsey* died, leaving the complainant his heir in tail, aged two years, *Edward Dorsey*, his uncle, was appointed his guardian. On the 9th of June 1784, the executors of *Caleb Dorsey* filed a bill against the complainant, to obtain a decree for the sale of more real property to pay *Lawson's* debt, for the one half whereof it was alleged the complainant was liable. On the 30th of October, 1784, *Edward Dorsey*, his guardian, appeared and answered. On the 4th of November 1784, a decree was passed for the sale of *Taylor's Forest*, &c. and *Edward Dorsey*, the guardian, appointed the trustee to sell. On the 7th of November 1784, the trustee's bond was filed. The time when the sales were made does not precisely appear, but they must have been made about the 20th of December 1784, for six weeks notice was directed, and *Edward*, (the minor,) is charged with interest on *Lawson's* debt to that date. By the decree the trustee is directed, before the money arising from the sales was distributed, to obtain a bond from the complainants in that case, "to *indemnify* the defendant from all charges and demands on account of *Law-son's* judgment, and from all claims and demands, which the defendant hath been, or is or may be made chargeable by the codicil of *C. Dorsey's* will, or for or by any other ways or means whatever." The bond of indemnity was

never given; the sales never were ratified; nor was there any order passed for the distribution. The bill in the present case was filed to defeat the sales, made under the authority of the decree in the above case, of the executors of *Caleb Dorsey;* and it alleges that *Edward Dorsey,* the guardian, had formed a determination to get his ward's land, and for that purpose he assented to its being liable to *Lawson's* debt; that he procured himself to be appointed the trustee, and through the agency of *Samuel Godman,* purchased most of the land, and for less than the value. Although the sales (such as they were,) were made as early as December 1784, yet they were kept back until the 6th of August 1789. The account of sales then returned states, that lots No. 1, 2, 3 and 4, containing 763 acres, (part of *Taylor's Forest,*) were sold to *S. Godman* for

£3,793  0  2

That lot No. 5, containing 102 acres, was
   sold to *Edward Norwood,* for        809 13 1½

£4,602 13 3½

The conveyance by the trustee to *Godman* was made on the 1st of March 1785, for the consideration of £3,733 0 1½, and the reconveyance to *Edward Dorsey,* the trustee, was on the 12th of December 1785, for the consideration of £3,743. The relief prayed for by the bill is—*First,* a reconveyance of the land deeded to *Godman,* on the vacating that deed. *Secondly,* an account of the profits. *Thirdly,* an exemption from *Lawson's* debt, because the land, the origin of the debt, had been sold, and the proceeds applied to the payment of the legacies. The defendants, in their answers, make no material admissions—*Samuel Godman,* one of the defendants, did not answer the bill, having died soon after it was filed. Commissions issued, under which testimony was taken, which proved, among other things, that *Samuel Godman* acknowledged, within a month after the sale, that he purchased the land for *Edward Dorsey,* and that the land was always held, possessed and used, by *Edward Dorsey,* who immediately after the sale commenced cutting wood, &c. and that *Godman* never was in possession, or exercised any acts of ownership over it. That *Godman* had recently been released as an insolvent debtor, and had no visible property. *Brutus Godman,* son of *Samuel*

1813.

Dorsey
vs
Dorsey

*Godman*, deposed, that after his father's death, about three years before his, *Brutus's* examination, at the house where his father died near *Elk-Ridge*, he remembers seeing, a- mongst his father's papers, a letter to his father from *Ed- ward Dorsey*, deceased, requesting his father to purchase the land called *Taylor's Forest* for him the said *Dorsey*.

The deponent did not recollect the date of the letter, or what had become of it, but he remembered that it requested his father to attend the sale for that business. The depo- nent did not know the hand-writing of *Dorsey*, but that the letter was signed with the name of *Edward Dorsey*.

KILTY, Chancellor, (September term 1808.) The main object of the bill appears to be to vacate the sale made by *Edward Dorsey*, as trustee, under the decree therein men- tioned, as far as it related to the property purchased by a certain *Samuel Godman*, (for the use, as it is alleged, of the said *Edward Dorsey*,) and to annul the deeds executed in consequence of the said sale, on such terms, as on an account taken should appear to be proper.

But there are other objects which will require to be stated and disposed of. The bill prays for an account of the rents and profits of the complainant's estate received by *Edward Dorsey*, as his guardian; but from the answers of the defendants, the evidence taken, and the arguments ad- duced, it does not appear that this is relied on as a distinct ground for relief, or if it is, that a case is made out to en- title the complainant to relief on that account.

Another account is, that the complainant should not be liable for any part of the debt due from *Caleb Dorsey* to *Alexander Lawson*, because the land, the foundation of the debt, had been sold and applied to the legacies under the will of *Caleb Dorsey*. This allegation goes to impeach the decree made by the former chancellor in November 1784, for the sale of part of the real estate of the complainant, on a bill filed by the executors of *Caleb Dorsey*, in which his will and codicil, with a copy of the judgment by *Lawson* against them, were exhibited.

This decree could be opened only by a bill of review, or by a bill or petition, alleging that it was obtained by fraud. From the arguments of the complainant's counsel, it ap- pears that the circumstance of the money due to *Lawson* not being chargeable to the complainant, is not relied on

a as distinct and substantive ground of relief, but to be taken into the account in case of a vacation of the sale, but if this should not be the case, the charge is not supported so as to entitle the complainant to a decree on that ground. The main object of the bill, as above stated, is considered also as resting on distinct grounds. *First*, the circumstances attending the filing of the bill for the sale of the complainant's land, the answer by *Edward Dorsey*, as guardian, and his being appointed trustee, as they are alleged in the present bill. And *secondly*, the charge that *Edward Dorsey*, the trustee, was in fact the purchaser by the agency of *Samuel Godman*, who was returned as such, and that the lands were sold to him for less than their value. As to the first ground, there is nothing to show that the executors of *Caleb Dorsey* had any view in filing their bill, and obtaining a decree for a sale, more than to raise the sum for which *Lawson* had obtained judgment against them. The conduct of *Edward Dorsey* in that suit is not so clear of suspicion, although in his answer he states that a sale would be for the interest and benefit of his ward's estate, and would avoid the ruinous consequences of accruing interest; yet it is to be observed, that the answer was put in with unusual promptness; that the facts in the bill were fully admitted, and that in addition thereto, his consent in writing was given to the sale about to be decreed, and that he was himself appointed trustee. The chancellor considers this as the most doubtful part of the case, connected also with the time and manner of making the report or return of the sale; but notwithstanding his desire that rules against fraud, (as expressed by his predecessor in one of the cases cited,) should be as strict as possible, he is obliged to determine that these circumstances, (independent of the purchase being made by *Godman* for the trustee,) are not sufficient to establish the charge of fraud, as made in this part of the bill. The second ground is viewed as the most important in the bill, because, without giving a positive decision on it, the chancellor is strongly inclined to the opinion, that if established, it would either by itself, or in corroboration of the other circumstances, be sufficient to vacate the sale. It is therefore necessary to examine particularly the evidence relating to this charge. The chancellor cannot admit the position, that the circumstances of this case are such as to throw the *onus probandi* on the de-

1813.
Dorsey
vs
Dorsey

fendants, that the sales were to and for *Godman*. They were so returned by the trustee, though at a late period, and the proof of the allegations in the bill must of course come from the complainant. The circumstances relied on for this proof are the continued possession of *Edward Dorsey*, the date of the deeds, and (according to the complainant's argument,) the want of evidence of any payment by *Godman*. But if *Godman* is considered as the real purchaser, or if the complainant fails to prove that he was not such, it cannot be required, after the lapse of so many years, that the payment of the purchase money by him should be proved by the present defendants. And in this part of the case the chancellor will consider the observations on both sides as to the time of filing the present bill. The bill for the sale of the present complainant's real estate was filed, and the decree passed, before the act of 1785. It might possibly have been filed under the act of November 1773, but was not so filed. That act gives to the infant six months after his coming to full age to show cause against the decree; and in *England*, the common course is, to decree in such cases with *nisi causa*, within six months after the infant should come of age; and this having been fixed on as a reasonable time, it seems to follow that an acquiesence, or a neglect of nearly six years, during three of which the trustee was living, and could have answered for himself, is a circumstance of considerable weight against the complainant, although not such as to be a bar to the relief prayed by him, if sufficient evidence should be produced; but the circumstances above stated do not amount to such evidence, although they create a strong suspicion. It remains to examine what is brought forward as direct evidence of the purchase by *Godman* having been made for *Edward Dorsey*, the trustee. *Caleb Owings*, one of the witnesses, says in answer to the 6th interrogatory, that it was so understood, (that is, that *Godman* purchased for *Dorsey*,) he thinks generally, at the time of the sale, but does not recollect that any person told him so. It is presumed there can be no doubt as to the insufficiency of this part of the testimony. The evidence of *Allen Dorsey* is to the same effect. *Samuel Norwood* and *Edward Norwood* both prove that *Samuel Godman* told them, or said, that he purchased the land for *Edward Dorsey*. The fact of his having so said must be considered as established fully

1813.

Dorsey
vs
Dorsey

by these witnesses; but it is also considered by the chan-
cellor, as a point clear of doubt, that his declarations, as
proved, not in the presence of the other party, and not
assented to or uncontradicted by him, cannot be received
as evidence. The next testimony is that of *Brutus God-
man*, which is at least equally objectionable; for although
the counsel for the complainant argues, "That the fact of
such a letter being there is proved by him," yet it will ap-
pear to be a fact having no weight in the cause. This
witness on his first examination, deposed, that about the
year 1803, he remembered seeing among his father's papers
a letter from *Edward Dorsey*, deceased, to the said *Samuel
Godman*, to purchase the said land for him. But on his
cross-examination he states that he had no other knowledge
that the letter was written by *Edward Dorsey* than that
his name was signed to it. He does not say that he had
ever seen him write, or had any knowledge of his hand-
writing. If the letter was produced, and depended on his
knowledge only, it could not be received as evidence, and
yet it would be apparently a stronger circumstance than
his deposition that such a letter existed. It may be an un-
fortunate circumstance for the complainant, that *Brutus
Godman* did not know the hand-writing of *Edward Dorsey*,
or that he did not preserve the letter. But supposing it to
have been genuine, it only induces a belief that evidence
then existed which is now totally lost. And here, without
borrowing from the defendants' counsel, his remarks as to
the cyphers, it may be justly said, that if what is stated
by *Caleb Owings* and *Allen Dorsey*, as to what was under-
stood at the sale, is not evidence; if the declarations of
*Samuel Godman* to *Samuel* and *Edward Norwood* are
not evidence, and if the circumstances as to the letter
stated by *Brutus Godman* are not evidence, no greater
effect can be produced by combining them together. It is
certain that the terms of the decree for the sale, were not
fully complied with by the trustee. The return or report
was not made in due time, and the bond of indemnity
against *Lawson's* claim has never been procured; but the
report, though made at a late period, appears to have been
so far received by the court, that no positive measures were
taken against it; and it is not alleged that the complainant
has sustained any loss for want of the bond of indemnity,

or that he has been called on to pay again the debt due to *Lawson;* so that the money, for which the land sold, must be considered as applied to that debt, according to the report. For the reasons herein stated—*Decreed,* that the bill of the complainant be dismissed, but without costs. From that decree the complainant appealed to this court.

The cause was argued before CHASE, Ch. J. and BU-CHANAN, NICHOLSON, and EARLE, J.

*Key,* for the Appellant. By the will of *Caleb Dorsey,* authority was given to his executors to sell certain lands, (but not *Taylor's Forest,*) to pay the legacies; the executors did sell, but it is not stated by them what lands they sold, and to what amount. The special authority given by the will to the executors was limited to the sale of the entailed lands for the payment of the legacies alone. The act of assembly of 1773, ch. 2, for the sale of the lands of *Caleb Dorsey,* for the payment of the legacies, was simply an authority to sell the *Curtis* creek lands, and there was no authority given to them to sell *Taylor's Forest,* either for the payment of the debts or the legacies. It is contended, on the part of the appellant, 1. That the bill, proceedings, and decree thereon, in 1784, for the sale of *Taylor's Forest,* were irregular. By the record of those proceedings it appears that the bill was filed against the appellant, then an infant, in June 1784, by the executors, for the sale of the real estate of *Caleb Dorsey* to pay *Lawson's* debt, without showing how the personal assets had been administered; that an answer by the guardian was filed in October 1784, admitting all the allegations stated in the bill, and praying that particular lands might be sold, and amongst others, *Taylor's Forest.* On the 4th of November 1784, a sale was decreed for cash, and *Edward Dorsey,* the guardian, appointed the trustee to make the sale, who gave bond on the 17th of November 1784. Six months notice in some newspaper was required by the decree to be given previous to the day of sale. The sale took place, of *Taylor's Forest* alone, before the 20th of December 1784, so that no such notice was or could be given, and on the day of sale, *Lawson's* debt was paid. There was no report of the sale made to the court, but simply an account filed in 1789 charging money paid to *Lawson,* &c. and crediting the sales to *God*-

man and *Norwood* of *Taylor's Forest*, and of this account there was no confirmation by the chancellor; nor was any bond given, as directed by the decree, by the claimant to the defendant, in the proceedings. It is contended that there was no legal foundation for filing the bill in 1784 by the executors, as they were not bound to pay the codicil legacies; that the bill was filed with a suppression of facts, and the statement in it did not place the subject matter properly before the chancellor; but being admitted by the guardian, the decree passed as a matter of course.

2. That *Edward Dorsey*, the guardian of the infant defendant in those proceedings, being the proprietor of the forge at *Elk Ridge*, and *Taylor's Forest*, a large body of woodland contiguous thereto, he was desirous of having that tract of land sold, so that he might become the purchaser, he therefore caused those proceedings to be instituted.

3. That the land was sold to *Samuel Godman* for the benefit of *Edward Dorsey*, the trustee, and for a sum of money greatly below its value.

4. That *Edward Dorsey*, the trustee, had possession of the land when he sold it, and continued to hold and claim it until his death, having immediately after the sale commenced cutting wood, &c. for his own use and benefit.

On the *third point*, he insisted, that it was fully proved by the testimony that *Godman* purchased the land for *Edward Dorsey*, the trustee. That even if *Dorsey* furnished *Godman*, (who is proved not to have been in a situation to make the payment,) with the money to pay for the land, he was a trustee for the benefit of *Dorsey*. He referred to *Villiers vs. Villiers*, 2 *Atk.* 72. To prove that the declarations of *Godman* were evidence, he referred to *Strode vs. Winchester*, 1 *Dickins*, 397. *Willis vs. Willis*, 2 *Atk.* 71. *Man vs. Ward, Ibid* 229. That the trustee could not purchase at his own sale, he cited *Whepdale vs. Cookson*, 1 *Ves.* 9. *Munro vs. Allaire*, 2 *Caine's Cases*, 192. *Oldin vs. Samborne*, 2 *Atk.* 15. *Sugd.* 391. *Turner vs. Bouchell*, (ante 99;) and *Conoway vs. Green*, 1 *Harr. & Johns.* 151. The recent insolvency of *Godman* shows that he could not command so large a sum as the purchase money for the land; and *Dorsey's* retaining the possession, and cutting so large a quantity as 30,000 cords of wood off the land, as is in proof, shows evidently that *Godman* purchased

1818.

Dorsey
vs
Dorsey

for *Dorsey*. The part of the land sold to *Norwood*. proved not to be better in any respect, brought a much higher price than that purchased by *Godman*, which was struck off for a sum $6000 less than its value.

*Martin, Shaaff* and *Harper*, for the Appellees, contended, 1. That all the necessary and legal parties were not before the court; and that as the bill was dismissed it was of no consequence upon what ground, if it was correctly dismissed. They insisted that the legatees under the will and codicil of *Caleb Dorsey*, should have been made parties, that they might show whether or not they had any interest. They referred to *Harr. Chan. Pr.* 32, 33. 1 *Eq. Ca. Ab.* 72. 2 *Eq. Ca. Ab.* 165 to 170. *Stafford vs. City of London*, 1 *Stra.* 95.

2. That the decree of 1784, which was fair and proper, and justified by the facts, could not be impeached; but that the copy of the proceedings and decree, as exhibited, not being under seal, cannot be evidence in this case. They cited *Norwood vs. Norwood*, 1 *Harr. & Johns.* 525.

3. That the declarations of *Samuel Godman*, made when he had an interest in the land, were not to be received as evidence against his alienee or vendee. They cited *Ford vs. Lord Grey*, 1 *Salk.* 286. S. C. 6 *Mod.* 44. That if *Godman* could not have been a witness at the time he made the declarations, they could never afterwards be evidence.

4. That the testimony of *Brutus Godman* could not be admitted in evidence on any principle, as he never had seen *Edward Dorsey* write, and did not know his handwriting, and because there was no evidence that the letter had been searched for and could not be found.

5. That there is not sufficient proof that *Samuel Godman* purchased the land at the instance and for the benefit of *Edward Dorsey*, the trustee; and that even if the purchase was for the benefit of the trustee, it did not, *ipso facto*, vacate the sale, which must depend upon application being made within a reasonable time to set it aside. That if the conduct of the trustee was fair and proper, and the sale was for the interest and advantage of the minor, it must be confirmed. That it had never been contended, in any case, that a purchase made by a trustee at his own sale, if a fair price was given, was considered to be a fraud.

1813.

Dorsey
va
Dorsey

*Pinkney,* (Attorney General of *U. S.*) in reply. 1. The objection as to the want of parties, if a valid one, which is not admitted, ought to have been urged in the court below. If all the necessary parties have not been made, this court may remand the record to have the proper parties added. But the court may presume the legacies have been paid from the lapse of time. It is wholly unnecessary for the legatees to be parties; and if they were parties, no other decree could be made, than would be if they were not parties.

2. As to the record of the proceedings on the bill in 1784, this court may revise the decree on the same evidence which the chancellor had before him, and he might look into the records of his own court, and form his decree accordingly. Here the copy exhibited in the court of chancery was not objected to, of course it was allowed to be considered as evidence, because, if objected to, it might have been easily made evidence. He cited *Carroll et al. Lessee vs. Norwood,* 4 *Harr.* & *M·Hen.* 290. Here the proceedings referred to constitute a part of the record before this court, and is not similar to *Norwood vs. Norwood,* where the proceedings had not been exhibited, but were merely referred to. But without these proceedings of 1784, the appellees have no case, because without them, it does not appear that they have a title to the land under any sale. Yet by their answer they have admitted the proceedings as evidence, by not objecting to them, nor exhibiting different proceedings. This court acts here as the chancellor acted in his court, and the same rules of evidence in that court govern in this, and if the proceedings were evidence there, so they will be here.

3. The land in question being an estate in tail in the appellant, it was not liable to sale for debts under the decree of 1784. The debt due to *Lawson* was a mere personal charge on *Samuel Dorsey,* which could not affect the appellant, the heir in tail.

4. The declarations of *Samuel Godman* are evidence. The recital in a deed is evidence against the grantor, and his assigns, not on the principle of notice, but because it contains the declarations of the grantor; and upon the same principle *Godman's* declarations are proof.

*Shaaf* and *Harper,* with the permission of the court, in

1813.

Dorsey
vs
Dorsey

answer to the new matter urged by the counsel for the Appellant in reply, stated:—

1. It has been contended by the appellees, that the legatees under the codicil of *Caleb Dorsey*, the common ancestor, ought to be before the court, because, even if the present suit should be decided in favour of the appellees, yet these legatees may in future assert their claim, and that the court of chancery will not allow the same question to be twice agitated. The appellant objects, that this ought to have been urged in the court below. This objection cannot prevail, as is proved by the authorities, and by the judgment of this court in the case of *Coale et al. vs. Mildred's Adm'r. (ante 278,)* where the decree was reversed for want of parties, and yet no objection of that kind was urged below. It is stated that this court may remand the record to have the parties added. This is not admitted by the appellees, because the chancellor may in such case either dismiss the bill, or give leave to amend, in his discretion. He has here exercised this discretion; and there is no instance of reversal for an undue exercise of discretion; this case is still stronger, for here the bill was dismissed, which may well be, for want of parties, the decree, therefore is right, and must be affirmed, and on affirmance cannot be remanded. Again, it is said that the court must presume these legacies are paid from the lapse of time; this cannot be, because, when lapse of time is relied on as evidence of payment, the fact of payment must be alleged. In this case there is no such allegation, on the contrary, the bill seems to imply, that the legatees were not paid.

2. On the subject of the copy of the record in chancery in 1784 being evidence, it is admitted that any court may look into its own *records*, every court being acquainted with its own records; but when the judgment of an inferior court is revised, the appellate court can, judicially, only know what is thus looked into by the inferior court, to be a record, by the legal evidence of the fact, *viz.* by a copy under seal. Again, it is said that this copy not having been objected to, is evidence. Not so, because this is only an allegation of the bill, and the same as if copied into it, and because either party may file any paper in chancery, and the court decides, only, on the legal evidence; the contrary in a court of law, where any paper

read in evidence, and not objected to, is considered as admitted; this answers the case of *Carroll et al. Lessee vs. Norwood.* It is not conceded that without the record of 1784 the appellees have no case, because, being the statement of the bill, the complainant is confined to it. And because the bill states the existence of a bill, answer, decree and sale—The answer admits a bill, answer, decree and sale, so far the parties are *not* at issue—The bill states a certain copy, the answer does *not* admit this; but refers to the proceedings in chancery, alleging a different conclusion of the case, *viz.* a ratification. Every necessary allegation must be proved, and if the answer is silent as to it, the course is to except to the answer. Again, if it should be thought that no legal title appeared in the appellees, this consequence follows, that the legal title would still be in the appellant, and that his remedy would not be in equity to vacate the deed, but at law, to recover possession by ejectment.

3. It is understood that the appellant's counsel argued, that this being an estate in tail in the appellant, it was not liable to sale for debts, under the decree in 1784. It is conceded, that the estate of the issue in tail, was not then liable for the debts of the tenant in tail; but this decree was for the payment of the debt of the tenant in fee, who by devise created the estate tail, viz. *Caleb Dorsey,* the common ancestor.

4. On the subject of *Godman's* declarations.—The application of the doctrine contended for by the appellant's counsel is disputed by the appellees: Because the reason why the recital in a deed is evidence, is that the deed, being the title of the grantee, he must take the deed as it is, not only the conveying part, but the recital also, he cannot separate the part which is in his favour, from that which operates against him. But the parol declarations of the grantor, made before the title accrued, during its continuance, or after its expiration, stands on different grounds. There is here no evidence of any declarations of *Godman* made at the time of his purchase. The debt to *Lawson* is expressly charged on *Samuel* and *Edward,* generally, by the codicil; and the codicil legacies are specifically charged on the lands devised to *Samuel* and *Edward.* Whence it appears, as the appellees contend, that the lands of *Samuel* were chargeable in the hands of

1813.

Dorsey
vs
Dorsey

1813.

Dorsey
vs
Dorsey

the complainant with one half of the debt to *Lawson*, the personal estate being entirely insufficient for debts and legacies, and consequently, that the bill in 1784 was properly filed, and that *Edward Dorsey* acted correctly in admitting the allegations contained in it. Should it be thought that he did not act correctly, still it must be admitted to have been a very doubtful point, in which his conduct may fairly be ascribed to honest mistake, and cannot be regarded as proof of fraud, in which light the argument of the appellant requires it to be viewed. As to the idea of the appellant's counsel, that the debt to *Lawson* was a mere personal charge on *Samuel*, which could not affect the appellant, his heir in tail, it appears to be fallacious in both its parts. The charge was not merely personal, but was a charge on his estate; and it was a debt due from him who created the intail, that is, *Caleb Dorsey*, and therefore binds his lands in the hands of his devisee in tail, or the remainder-man, who equally claims under him by the devise.

BUCHANAN, J. delivered the opinion of the court. This suit appears to have grown out of irregularities practised by those who had the settlement of the estate of *Caleb Dorsey*, but whether by design, misconception, or the common assent of the parties immediately interested, is difficult to determine. No part of the real estate of *Caleb Dorsey* is charged, either by the will or codicil, with the payment of debts, though by the will, all the personal property is, and so much of the personal estate remaining, after the payment of the debts, as should be found not necessary for carrying on certain iron works, is charged with the will legacies. Several specified tracts of land, not including that in dispute, are alone charged with the payment of the legacies raised by the will, but all the lands devised to *Samuel* and *Edward Dorsey*, either by the will or codicil, are charged with the codicil legacies. At the time of executing the will, the purchase from *Lawson* had not been made, from which circumstance, and the provision in the codicil, directing *Samuel* and *Edward Dorsey* to pay the debt due to *Lawson*, it is obvious that *Caleb Dorsey* did not intend that his executors should apply any part of his personal property to the payment of that debt; and if the executors had, after paying all the debts except *Lawson's*,

applied the residue of the personal estate, with the proceeds of sales of the land directed by the will to be sold for that purpose, to the discharge of the legacies, leaving the debt due to *Lawson* to be paid by *Samuel* and *Edward Dorsey,* they would have acted in conformity with the intentions of the testator; which they may have done, though it no where appears. But notwithstanding it seems to have been the intention of *Caleb Dorsey* to make the debt to *Lawson* a personal charge on *Samuel* and *Edward Dorsey,* it was still in law a debt due from him, with which the whole of his estate was chargeable, and it is now not necessary to inquire whether the personal property was exhausted, and so followed up by *Lawson,* as would have enabled him to proceed against the real estate of *Caleb Dorsey* in the hands of *Edward Hill Dorsey,* the appellant. The decree of the court of chancery, subjecting a part of that estate to be sold for the payment of one half of *Lawson's* debt, is in full force, and cannot in this case be impeached by this court; though it is difficult to account for the executors of *Caleb Dorsey* having gone into chancery to procure a sale of the lands, in the hands of *Edward Hill Dorsey,* to discharge the debt due to *Lawson,* without showing what application they had made of the personal estate of *Caleb Dorsey,* or of the money for which the lands, charged by the will with the payment of the will legacies, and the lands and works bought of *Lawson* were sold; nor is it less remarkable that *Edward Dorsey,* then the guardian of *Edward Hill Dorsey,* should have consented to a decree for the sale of the real estate of his ward, without calling upon the executors to show how they had applied the funds which had come into their hands. The whole transaction wants explanation, but is not so marked as to bear the character of fraud. It is stated in the answers in this case, that no part of the money, for which the lands and works bought of *Lawson* were sold, was applied to the payment of *Lawson's* debt, nor is there any proof that it was so applied. *Samuel Dorsey,* who was one of the executors, until the year 1777, when he died, cannot well be supposed to have acquiesced in any scheme to cheat his son; and the will and codicil of *Caleb Dorsey* are referred to by the executors in their bill against *Edward Hill Dorsey,* as exhibits. With a knowledge of the provisions of both of which instruments the chancellor decreed the sale.

The decision, therefore, of the question in this case, whether *Edward Dorsey* bought the land sold by him as trustee, at his own sale, through the instrumentality of *Samuel Godman*, must be uninfluenced by any thing anterior to the decree of 1784, and must be governed by the other evidence in this cause particularly relating to that transaction.

The testimony of *Brutus Godman* was properly rejected; he had never seen *Edward Dorsey* write, and had no knowledge of his hand-writing; proof, therefore, of the contents of the paper spoken of, was clearly inadmissible. But this court think the chancellor erred in not receiving the declarations of *Samuel Godman*, that he had purchased the land in question for *Edward Dorsey*. The declarations of a man respecting his title, made before he parts with his estate, are evidence against him, and all claiming under him; and the distinction attempted to be taken between the case of a voluntary transfer, and that of a conveyance for a valuable consideration, is not supported. In this case *Godman* was the purchaser at the sale, received a conveyance from *Dorsey*, the trustee, and afterwards reconveyed to him; and it is clear, from the proof in the cause, that his declarations were made between the time of the sale, and the date of his deed to *Dorsey*; they would have been good against him as admissions respecting his title, and are competent evidence against those claiming under him, who stand in his place, and hold the land subject to any imperfection of title which attended it in his hands. But the declarations of *Godman* are not the only evidence that he made the purchase for *Dorsey*. The situation of *Godman* at the time, the proof that he never took possession of the land, entered upon, or exercised any act of ownership over it; and the circumstance that *Taylor's Forest*, which was devised to *Samuel* and *Edward Dorsey*, as tenants in common, had been divided before the sale; that *Edward Dorsey*, who as guardian of *Edward Hill Dorsey*, was in possession at the time of sale of the part sold to *Godman*, never parted with the possession, but immediately after the sale commenced cutting down the wood that stood upon it for the use of his furnace, and continued to cut it until his death, or until all was cut down, are very strong and difficult to be resisted. This court are therefore of opinion, upon the evidence before

them, that *Samuel Godman* did buy the land in question for *Edward Dorsey*, the trustee; and that, on the established principle, that a trustee can never be a purchaser at his own sale, the deeds made in consequence thereof ought to be vacated, (there being no evidence to satisfy the court that *Edward Hill Dorsey*, the only person interested, ever assented to the purchase,) and that the decree of the chancellor ought to be reversed.

The court are also of opinion, that the appellant is liable and ought to pay to the representatives of *Edward Dorsey* the amount paid by him to *Alexander Lawson*, with a commission of five *per cent*, on the sum for which the land bought by *Edward Norwood* was sold, with other incidental charges, subject to a deduction for the amount of *Edward Norwood's* purchase, and an allowance for interest, as by the account referred to in the bill as an exhibit. But that he is entitled to recover the rents and profits of the land struck off to *Samuel Godman*, which under the facts and circumstances in this case, the court think are equal to the interest of the sum, for which he is so answerable, and that the one is, and ought to be taken as a just and full set off against the other. Upon which principles the court have caused an account to be stated, which exhibits a sum due to the representatives of *Edward Dorsey*, amounting to $8778 80.

Chase, Ch. J. was of opinion, that the proceedings in chancery in 1784, on the bill by the executors for the sale of the land in question, were irregular; that the land was devised in tail, and was not liable to the debt for which it was sold. He gave no opinion upon the other questions raised in the case.

The Court—*Decreed*, "that the decree of the court of chancery passed in this cause, be and the same is reversed." *Decreed* also, "that the sales to *Samuel Godman* of parts of the tract of land called *Taylor's Forest*, lying in *Baltimore* county, be and are hereby annulled and declared to be void, and that the deeds executed in consequence thereof, that is to say, the deed from *Edward Dorsey* to *Samuel Godman*, bearing date the 1st of March 1785, and the deed from *Samuel Godman* to *Edward Dorsey* for the said land, bearing date the 12th of December in the same

year, be and they are hereby vacated, and declared to be null and void." *Decreed* also, "that the appellant, *Edward Hill Dorsey*, bring and pay into the court of chancery, for the use of the representatives of the said *Edward Dorsey*, the sum of $8,778 80, which sum is ascertained to be due to them by the account hereunto annexed; and that when the said sum of money shall be so paid and lodged in the court of chancery, and not before, the heirs of *Edward Dorsey* deliver to the appellant full and peaceable possession of all that part of the land called *Taylor's Forest*, which is included in the deeds before mentioned." *Decreed* also, "that the appellees pay to the appellant the costs which have accrued in this court, and in the court of chancery, and by him expended and paid," and, "that the chancellor make and pass all such orders and decrees as shall or may be necessary to carry this decree into full and complete effect."

DECREE REVERSED, &c.