# George McDowell and others, *vs.* Samuel H. Goldsmith.

Where a deed is impeached by the creditors of the grantor as fraudulent in fact as against them, the fraudulent grantee may plead and rely upon the statute of limitations as a bar to their claims.

Limitations will bar as to trusts created by operation of law, though it may not as to express trusts.

A mortgage was executed under the provisions of the act of 1833, ch. 181, and a decree obtained thereon in the equity side of Baltimore county court.

Afterwards a bill was filed in chancery by the creditors of the mortgagor to set the mortgage aside as fraudulent as against them.  HELD :

That the decree in equity, under the said act, was sufficient to protect the mortgagee against inquiry in this case into the question of fraud in obtaining the mortgage.

Where a promissory note is in the hands of the holder, endorsed by the payee, the inference is, that it was endorsed, if not on the day of its date,.at least before its maturity.

As a general rule, a party will not be permitted,.by his own declarations, to defeat his prior deed, but in some cases the declarations and admissions of a grantor will be received where the effect may be to impair the title of persons claiming under him.

The quality and intention of acts may be proved by evidence of declarations accompanying or so nearly connected with them in point of time, as will serve to explain their true character and purpose.

The declarations need not be made immediately with the occurrence of the act, but may be before and sometimes after, provided they be calculated to unfold the nature and quality of the facts they are intended to explain, and so to harmonize with them as to constitute one transaction.

Declarations of a grantor,.made, not in the presence of the grantee, to the conveyancer who prepared the deed, tending to show that it was fraudulent, are admissible, as part of the *res gestæ*, against the grantee, in a case where the grantor's creditors seek to vacate the deed as fraudulent as against them under the the statute of 13th *Elizabeth*.

CROSS-APPEALS from the Court of Chancery.

The bill in this case was filed in the equity side of Baltimore county court, on the 25th of August 1845, by McDowell and others, creditors of Elizabeth Osborne, to vacate three conveyances made by her to Goldsmith.  The *first*, dated the 14th of July 1841, conveying a lot of ground for $2000.  The *second*, dated the 5th of November 1842, being a mortgage of real and personal estate, subject to the acts of 1833, ch.. 181, and 1836, ch. 249, to secure an indebtedness of $21,500;. payable in five years.  The *third*, dated the 16th of February 1844, conveying her equity of redemption in the mortgaged premises in consideration of the mortgage indebtedness, and of the further sum of $7550..

The bill alleges that all these conveyances are fraudulent in fact; that they embrace all the property of Osborne; that by them Goldsmith. claims the whole of it as absolutely his own.;

that there is no other property out of which complainants' debts can be paid; that Goldsmith did not pay the consideration mentioned in said deeds, but that they were executed without any legal consideration, and for the purpose of protecting the grantor's property from her creditors; that shortly before, at the time of, and repeatedly after their execution, she declared they were executed without consideration, and merely for the purpose of protecting her property from her creditors, who were urgent for the payment of their claims against her; that the property mentioned in the two last deeds continued in her possession, and that Goldsmith repeatedly admitted that it did not belong to him, but that he held the title nominally to protect it from her creditors; that he executed, before a justice of the peace, an instrument acknowledging that he held the property for her benefit, and to protect it from her creditors; that it stood on the tax books in her name, and she paid all the taxes thereon up to the time of her death, in April 1845; that she received the rents for her own use, and paid the ground rents thereon; that the insurance was in her name down to the 1st of January 1845, and that Goldsmith did not, during her life, effect any insurance thereon.

The bill further charges that Goldsmith was not, at the time of the execution of these deeds, engaged in any business or possessed of any means or credit by which he could possibly have raised or commanded the large amount of money pretended to have been paid and advanced by him to said Osborne, and calls upon him to answer particularly how she became indebted to him in the sum of $21,500; if for money loaned, at what times, in what sums, and in whose presence it was loaned? if it was his own money, how he acquired and became possessed of it, with what bank or individual he had it on deposit, and whether it consisted of coin or paper? if not his own money, to whom it belonged, and upon what terms and in what sums he obtained it; in what money, at what time and place and in whose presence he paid the $7550, the alleged consideration in the last deed? where he has resided for the last ten years, what business engaged in, what capital

41    v.6

he had in business, and what were his annual profits? what property he had owned in that time, to whom he had disposed of it, and what he now owns? whether he did not execute and deliver to said Osborne a writing acknowledging that he had no legal title to said property, or only a lien upon it for a sum much less than the considerations mentioned in the deeds, if he did, whether he has seen that paper since her death? if he has, then when, where, and in whose possession he saw it, and what has now become of it?

Goldsmith, in his answer, puts the complainants to proof of their claims, and *pleads and relies upon the statute of limita- tions* against such as may be shown to exist. He admits the execution of the first deed, and avers that the consideration of $2000, therein expressed, was parcel of a much larger sum then owing to him by said Osborne, and was paid by discount- ing the same from said debt; that it was executed *bona fide* and absolutely, and without any view, either by himself or her, of delaying, defrauding, or injuring her creditors, and that before this suit he had sold the property. He further avers, that confiding in her solvency, he continued to loan her money from time to time, until the 5th of November 1842, when, upon settlement, she was found indebted to him for money loaned by himself and wife, in the sum of $21,500, for which he demanded security, and at his solicitation she executed the mortgage of that date. He admits that she was then in- debted to others, but he did not consider her in insolvent or failing circumstances. He denies that, in making this mort- gage, either of them was influenced by any desire or motive to protect the property against her creditors, or to defraud, delay or injure them. He admits that she remained in pos- session of the property until the 6th of December 1842, when, finding the interest remained in arrear, he filed his petition in Baltimore county court, as a court of equity, in pursuance of the provisions of the acts of Assembly under which the mort- gage was executed, and on the same day obtained a decree for the sale of the mortgaged premises. That subsequently, on the 16th of February 1844, she, having determined to re-

move to New York, and having no other means of paying him, proposed that he should buy her equity of redemption in the mortgaged premises, to which proposition he assented, and agreed to pay her therefor the sum of $7500, which was, as he believes, the full value thereof, and more than he would have given under any other circumstances, and to carry this agreement into effect, the last of said deeds was executed.

He avers that the consideration in said deed was *bona fide* paid by him, in part by the discount of the balance of his account for interest, by advances since the mortgage of $3250, and the residue of $4500 paid in money the day the deed was executed. He denies all motive or intention thereby to protect the property against said Osborne's creditors, or to delay, defraud or injure them, nor does he believe that she was influenced by any such motive. He denies that she ever declared to him, or in his presence or hearing, that either of these deeds was executed without consideration, and for the purpose of protecting her property from her creditors, nor does he believe that she ever made such declarations to others, but if she ever did, he is advised they cannot prejudice his title. He denies that he ever admitted that the property did not belong to him, or that he held the title nominally to protect it from her creditors, or that he ever executed any writing acknowledging that he had no legal title thereto, or had only a lien thereon for a sum less than is mentioned in said deeds, but admits that at the time of the execution of the last deed, he verbally promised that he would resell the property therein described to said Osborne at any time she should become able and willing to repay him the money he had advanced her, as aforesaid.

He then states, that after the execution of the last deed, said Osborne became his tenant of the premises, and paid him rent therefor. That he is unable to state the particular times at which he made the loan to her of the $21,500; that said Osborne was indebted to his wife in a considerable sum at the time of their intermarriage in 1832, and that from that time to 5th of November 1842, he made numerous loans to her, and said sum was the result of all their dealings, includ-

ing the sum so due his wife. He avers that he has no book or books of accounts. In making said loans he sometimes took said Osborne's note, at other times he would make a loose memorandum thereof, and again he would suffer the loan to rest in the recollection of the parties. From time to time settlements were made, when he would take her note for the balance due, and surrender or destroy all previous securities. That in addition to his individual means, he occasionally obtained money from his wife, who had a valuable separate estate. That he has been his own banker, (excepting a short time, in 1836, when he made deposits with the Messrs. Cohen,) taking care to keep his money actively employed. That he dealt indiscriminately in coin and paper, and doubtless made some of said advances in coin, though for the most part they were made in bank paper. That his dealings with said Osborne were, for the most part, at his dwelling house, and either without a witness or in presence of his wife alone, and sometimes the advances were made by his wife, in his absence. He is unable to specify any instance in which he made advances in the presence of any particular individual, or to discover in what kind of money, in whose presence, at what places and at what times he paid her the sum of $7550, except as before stated. That he has for the last fifteen years resided in Baltimore, and for a number of years has been engaged in loaning money and dealing in securities and property. Of all the particulars of his business during that series of years, and of the profits and losses on each transaction, he submits he is not bound to speak, nor to discover what is the value or what are the particulars of his present estate, and to all such interrogatories, therefore, declines an answer.

The questions decided in the case render unnecessary any statement of the voluminous testimony taken under the commissions, except that of Julia McGee and Grafton D. Spurrier, as to the declarations of said Osborne, in reference to the last of the deeds referred to.

The first of these witnesses, McGee, states that the circumstances attending the execution of the deed of the 16th of

February 1844, were that some few of Osborne's creditors had presented their claims; that Goldsmith came to her house and told her that her creditors were pushing her and would seize on her property; that Osborne then got witness to go round and see her creditors, to ask them for time; this was about January 1841; the creditors whom witness called on were all willing to wait for their money except one; that a few days after this, Goldsmith called on Osborne, and was there several times in the day, and said Osborne told witness, on the morning he called, that Goldsmith wished her to make over her property to him, and witness overheard him say to said Osborne, "this is the only way in which you can save your property, Betsy;" Goldsmith remained a few moments and then went out with some papers which looked like deeds, and immediately after he left, said Osborne went out without speaking to any one; that she remained away some time and returned crying; that witness being called, then went into her room, when she told witness that she had made over her property, or some of it, to Goldsmith.

Spurrier, the conveyancer, who prepared the mortgage of 1842, and the deed of 1844, states that when the mortgage was prepared, Osborne and Goldsmith were both present in his office, and the instructions for its preparation given in presence of both; that as regards the deed of 1844, Goldsmith first called and told witness that Osborne would call on him about said deed, which she did, and gave him instructions as to its preparation. When Goldsmith came, he said that such a deed was to be prepared, and that Betsy Osborne would call and give deponent instructions about it. When said Osborne called on him in relation to said deed, witness asked her if it was possible that she was about to convey her interest in said property to this man, and if she knew what she was about? She said it was not to be an absolute deed of the property; that she had every confidence in Goldsmith, and that he would reconvey back to her the property upon the payment to him of the sum of from $6000 to $8000, (he cannot recollect the precise sum,) and that Goldsmith would give

her a written agreement to that effect; she stating at the time that creditors were pressing her, and that she made the deed absolute then to prevent her creditors from seizing her property, and dragging her furniture about and taking it from her house. Goldsmith was not present at this conversation, nor at any conversation between witness and said Osborne, except at the taking of the memoranda on instructions for the mortgage.

To the testimony as to these declarations of said Osborne, the defendant filed exceptions. The other proof in the case, and the facts as to the claim of Sarah Ann Truitt, are sufficiently stated in the opinion of this court.

The Chancellor (JOHNSON,) decided that the plea of limitations set up by the defendant was available against the claims of all the complainants, except said Truitt, and passed a decree vacating the deed of 1844, as against her, as the holder of a promissory note of said Osborne for $1100, dated 6th of November 1843, and such other of the creditors of said Osborne as shall hereafter come in under the decree and prove their claims, and for a sale of the equity of redemption in the premises included in said deed to pay the said claims. The decree then reserves for further directions all questions in regard to the claim of said Truitt on the note for $2800, dated the 21st of October 1844, dismisses the bill without prejudice so far as it asks relief against the deed of 1841, and the mortgage of 1842, and dismisses it absolutely as to all the complainants except said Truitt. The opinion of the Chancellor, accompanying this decree, is reported in 2 *Md. Ch. Decisions*, 370, where, also, a more extended statement of the allegations of the bill and answer will be found.

From this decree both Goldsmith and the complainants appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*S. T. Wallis* and *Chas. H. Pitts*, for the creditors, insisted

on their appeal, that this being a case where the deeds were impeached for *fraud in fact*, they could be so impeached by *subsequent* as well *antecedent* creditors, (3 *Md. Ch. Dec.*, 477, *Brinton vs. Hook.* 8 *Wheat*, 229, *Sexton vs. Wheaton.* 1 *Md. Rep.*, 470, *Waters vs. Dashiell.* 1 *Story's Eq.*, sec. 356,) and then argued the following points:

1st. That the proof in the case, in reference to the transactions impeached, is abundantly sufficient to fix fraud in fact both upon Osborne and Goldsmith, and the chancellor should have pronounced the mortgage of 1842 void, against the creditors of Osborne, notwithstanding the decree of Baltimore county court passed thereon, *ex-parte*, under the act of 1833, ch. 181. The proceedings under that act are *ex-parte*, the decree is not the result of *judicial* determination. The court *investigates* nothing, no party could come in and contest the right to a decree, and until the fund is in court, no *contest* can arise. 3 *Md. Ch. Dec.*, 39, *Eichelbergher vs. Harrison.* The mortgage and the decree are but parts of the same proceeding, the decree is a mere accessary to the mortgage, and if the latter is fraudulent the former must fall with it: as to the effect of the act of 1833, see 7 *Gill*, 305, *Williams vs. Williams.* But the purchase of the equity of redemption by Goldsmith is an estoppel to all proceedings by him, under the decree. He has by this purchase merged all his rights under the decree, and in fact become a defendant in the suit in which it was passed. But again, the deed of 1844, is a subject of inquiry, in this case, including its *entire* consideration, part of which was this very mortgage of 1842.

2nd. The declarations made by Elizabeth Osborne, before and at or about the time of making the respective conveyances impeached, were entirely competent to show her fraudulent intention with regard to those conveyances. 4 *Excheq. Rep.*, 78, *Ford vs. Elliott.* 11 *G. & J.*, 28, *Franklin Bank vs. Steam Navigation Co.* 12 *Iredell*, 247, *Harlaw vs. Moore.* 3 *G. & J.*, 188, *Kolb. vs. Whitely.* 9 *Gill*, 234, *Powles vs. Dilley.* 5 *Day*, 341, *Merrill vs. Meachum.* 8 *Gill*, 143, *Miller vs. The State.* 7 *Do.*, 5, *Garner vs. Smith.* 3 *H. & J.*, 426, *Dorsey vs. Dorsey.* 7 *Gill*, 374, *Richards vs. Swan.*

3rd. The chancellor erred in applying the three years bar of the statute of limitations to the claims of creditors in a case not of constructive fraud, but of *gross fraud in fact*, concocted between the grantor and grantee, for the express purpose of defrauding the grantor's creditors, especially as there is a total absence of allegation or proof, that the fraud had been discovered by any of the creditors, or that they had knowledge or notice of it at any time prior to the respective dates of their applications for relief. In such a case, the fraudulent grantee becomes a trustee *ex maleficio* for the creditors of the fraudulent grantor, and cannot plead limitations against their claims; he is not substituted in the place of the grantor so as to plead it. 2 *Whart.*, 245, *Englebert vs. Blanjot.* As a *general* rule, whenever in equity fraud is alleged, and proved, the statute will not run, and the *exception* is, that it runs only from the *discovery* of the fraud. 2 *Story's Eq.*, *sec.* 1521, *(a,)* and *note.* It is strictly a legal defence, and courts of equity are not, in terms, embraced by it, but they adopt it by analogy, or in obedience to it, according to circumstances, as where the jurisdiction is *concurrent*, because the party shall not, by electing his *forum*, avoid the defences which would be pleaded against him at law. The case of *Hertle vs. McDonald*, 3 *Md. Rep.*, 366, refers to *Dugan vs. Gittings*, 3 *Gill*, 138, as containing the true Maryland doctrine on this point, which is, that limitations is a legal bar only where the remedy at law and in equity is *concurrent*. Now is that the present case? We do not seek to establish our claims against *Osborne*, but the question is as against *Goldsmith*, is *he* the *bona fide* holder of the property covered by the deeds? as against *him* what possible remedy had we *at law?* The *fact* of indebtedness is not the *main issue* as between us and *Goldsmith*, but a collateral one. If Osborne had been sued by us at law, and had pleaded *non assumpsit* only, would any court in the land have permitted Goldsmith to come in and plead *limitations?* and if not, how can he set it up in her absence in this case? Where deeds are assailed and set aside for fraud, the property is to be dealt with as if no deed had been executed. 1 *Bland*, 69, *Strike's Case.* 2 *H. & G.*, 191, *Strike vs. McDonald.* 1 *Md. Rep.*, 455,

470, *Waters vs. Dashiell.* Here the fund was in court for distribution according to equity; it was taken from a party who had committed a *fraud*, and the chancellor says he has been guilty of *fraud*, and yet he is allowed to pollute the temple of justice by pleading limitations to the claims of those whom he has defrauded. Such a miscreant should be spurned from the court. Such a doctrine is *iniquitous* and cannot and ought not to be sustained. That lapse of time will not purge a fraud, see 2 *Eden*, 280, *Alden vs. Gregory.* 3 *Eng. Law & Eq. Rep.*, 24, *Irvine vs. Kirkpatrick.* 4 *How.*, 503, *Michoud vs. Girod.* At least they should have averred and pleaded as a defence, that we knew of the *fraud* for more than three years before suit brought. On this point see, also, the following cases: 2 *Sch. & Lef.*, 634, *Hovenden vs. Annesley.* 11 *Clark & Finnelly*, 714, *Charter vs. Treveylan.* 8 *Geo. Rep.*, 1, *Pendergrast vs. Foley.* 1 *Dana*, 373, *Frankfort vs. Markly.* 3 *Ala. Rep.*, 756, *Wood vs. Wood.* 1 *J. J. Marsh*, 402, *Pugh vs. Bell.* 4 *Do.*, 77, *Crane vs. Prather.* 3 *Dessa*, 223, *Croft vs. Townsend.* 4 *Dana*, 220, *Baker vs. Dobyns.* 3 *Monroe*, 40, *Haddix vs. Davison.* 3 *Leigh*, 729, *Shields vs. Anderson.* 1 *Hill's Ch. Rep.*, 121, *Eigleberger vs. Kibler.* 4 *Blackf.*, 84, *Raymond vs. Simonson.* 20 *Johns.* 47, *Troup vs. Smith.* 3 *Sumner*, 486, *Baker vs. Whiting.*

3rd. It is said Sarah Ann Truitt has no standing in court as to her claim of $1100. But this position cannot be sustained. The note of Osborne for this sum is dated the 6th of *November*, 1843, payable in three years, and by its terms was therefore due before this bill was filed. The *presumption* of law is, that the endorsement of a note was made at the time the *note was given*, and it was incumbent on the other side to show, that it was endorsed after it was *past due. Chitty on Bills*, 240, *note* 1. She had possession of the note and filed it as her claim, and the presumption is, that her possession was a continuing one from the date of the making of the note.

On the appeal of Goldsmith they argued: That the fraudulent combination between Goldsmith and Osborne, to defraud the

creditors of the *latter*, was abundantly made out by competent proof, and especially by the declarations of Osborne to Spurrier, when she made the deed annulled by the chancellor, and relied upon the authorities cited upon the 2nd point on their own appeal. That the answer of Goldsmith was suspicious, evasive, and false upon its face, and therefore not of that character which requires the evidence of two witnesses, or of one with pregnant circumstances, to overthrow it. He says he kept no book or memorandum, or account of this large amount of money, and there was no witness to their dealings. Goldsmith was a *Jew*, and there never was a transaction to the amount of $30,000 or $40,000, conducted in this manner by any *Israelite* from the time of the Exodus, down. The testimony of Julia McGee, was also competent and admissible; it is true she was a common prostitute, but it does not lie in the mouth of Goldsmith, who was the banker to this house of prostitution, to make this objection against her.

*Thomas S. Alexander* and *John V. L. McMahon* for Goldsmith, upon the appeal by the creditors, said that the only question of fraud open on this appeal is as to the mortgage of 1842, which the chancellor said he could not interfere with because of the decree of Baltimore county court, and because there is no allegation of fraud in obtaining this decree, and no prayer that it shall be set aside. This and the question of limitations are the only ones now open for discussion. They then argued:

1st. That the claims of the creditors are barred by limitations, each of them having matured more than three years before the claimants intervened in this cause. The *legal remedy* had been barred by limitations, and as the jurisdiction of equity over the subject matter of this suit was concurrent with that at law, and not exclusive, the remedy in this court was equally barred. Of all these claims but one was contracted *before* the deed was executed, and all of them had matured more than three years after the deed was put upon record, and more than five years before the bill was filed

attacking it for fraud. The first inquiry in all cases where deeds are attacked as fraudulent as against creditors is, has the creditor attacking it an enforceable claim against the property covered by the deed? There is no doubt but that these creditors could have sued at law, and their claims would have been barred as against Mrs. Osborne and her heirs, if the deed was out of the way. The rule is that the statute attaches *proprio vigore* to every *legal* claim, and follows it whenever it goes into equity for a *peculiar* equitable remedy, and that court applies the bar, not by *analogy*, but in *obedience* to the statute. The *test* is not whether the *remedy* is legal or equitable, but whether the *claim* is legal or equitable, and if the latter, equity *follows* the law as to limitations. 6 *B. Monroe*, 479, 481, *Field vs. Wilson.* 16 *Wend.*, 476, *McCrea vs. Purmort.* 24 *Do.*, 605 to 608, *Humbert vs. Trinity Church.* 3 *G. & J.*, 389, *Green vs. Johnson.* 3 *Gill*, 161, *Dugan vs. Gittings.* 7 *Johns. Ch. Rep.*, 90, *Kane vs. Bloodgood.* 7 *Gill*, 76, *Sindall vs. Campbell.* 3 *Md. Rep.*, 383, *Hertle vs. McDonald.* It is also settled that limitations will count up to the time of filing the claim. 12 *G. & J.*, 48, *Hall vs. Creswell.*

We start then with the concession that these are *legal* claims, against which three years is a bar, and that the statute had twice run, and now the question is, can *Goldsmith* avail himself of it? Is this plea one *personal* to the debtor, so that no one in privity with him, as heir, devisee or grantee, can plead it? It is settled that if an executor does not plead it, volunteers or creditors may come in and do so. 4 *Cond. Eng. Ch. Rep.*, 458, *Shewen vs. Vanderhorst.* A creditor may do it, and why? because he is interested in the fund. A devisee can plead it and he is but a *grantee* under the will. The fraudulent debtor can plead it. Anterior to the act of 1835, ch. 380, you could not reach property fraudulently conveyed without first obtaining a judgment at law, where limitations clearly could be pleaded by the debtor. That act says you may proceed at once, but the grantee is put in the shoes of the debtor, and if the indebtedness is disputed he

may demand an issue to try that question, and this issue unquestionably allows the plea of limitations.   The fraudulent grantor is not by his fraud stripped of *his* right to plead it. The theory on which a fraudulent grantee is said to be deprived of this right, is, that he is a constructive trustee, but there is no foundation for this theory,   Equity never proceeds against him on such grounds, for it removes the deed out of the way by *annulling* it.   *Strike's case*, in 1 *Bland*, 94, has settled that there is no trust.   See also 1 *Md. Rep.*, 470, *Waters vs. Dashiell*.   The only difference between a voluntary deed and one for value is, that in the former the fraud of the grantor is that of the *grantee*, because he has given no consideration, whereas in the latter there must be fraud both of the grantor and grantee to vacate the deed.   But the very point that a fraudulent grantee may rely upon the statute, has been decided in this State in the case of *Farmers Bank vs. Mulliken*, at December term 1840 of the Court of Appeals, where the deed was set aside *for fraud*, and limitations pleaded by the children of the *fraudulent grantee*, and *allowed*.   See also 4 *Florida Rep.*, 283, *Carter vs. Bennett*, and 3 *Texas*, 192, *McClenney vs. McClenney*,

The fraudulent grantee therefore may rely upon the statute, and the question then is, how far does the fraud, if conceded to exist, suspend the operation of the statute?   At law fraud could not be replied to the plea of limitations, and even in a case like this, it is a question whether you must not take the statute with its savings, for equity does not *extend* legal rights, but only *aids* them, and you must *first* show a *perfect* legal title before you can ask the deed to be set aside.   But the utmost that fraud can do to stop the statute, is that the creditor must make out that it has kept him in *ignorance* down to time within the statute.   Ignorance caused by fraud is the exception, and now on whom is the *onus* to prove this fact?   Who is to aver and prove the complainant's own rights?   Upon principle this belongs to the complainant and not the defendant, for he knows it, and it is within his knowledge *alone*, Upon authority, too, it is clear that the complainant must

allege and prove ignorance and the recent discovery. 3 *Peere Wms.*, 143, *South Sea Co. vs. Wymondsell.* 2 *Ball & Beatt.*, 129, *Blennerhasset vs. Day.* 7 *How.*, 829, *Stearns vs. Page.* 2 *Daniell's Ch. Pr.*, 736. *Mitford's Pl.*, 312. 6 *B. Monroe*, 481, *Field vs. Wilson.* Here the deed was upon record, giving notice to all the world of its existence for more than six years before the filing of these claims. Upon every point, therefore, the chancellor was right in deciding that the claims were barred.

But the mortgage was executed under the act of 1833, ch. 181, and a decree obtained upon it, and the bill does not ask that this decree shall be annulled. What is the use of setting aside the deed if the decree is left to stand? The decree is *rem adjudicatam*, and has passed into a *record debt*, which has merged the former debt. It would therefore be a useless and improper act to go behind the decree to set aside the deed. But again, the conflict of jurisdiction in such cases is a sufficient reply to all this. 4 *G. & J.*, 480, *Brown vs. Wallace.* 7 *Gill*, 482, *Albert & wife, vs. Winn & Ross.* 1 *Md. Ch. Dec.*, 351, *Brooks vs. Delaplaine.* *Ibid.*, 295, *Snyder vs. Snyder.*

On the appeal by *Goldsmith*, they said two questions are presented:—1st, whether the claim of Sarah Ann Truitt, one of the original complainants, as the holder of Mrs. Osborne's promissory note for $1100, is established; and 2nd, whether the deed of 1844 ought to have been set aside as having been made with intent to defraud this claimant? Upon these questions they argued:

1st. That the bill does not describe the note, and as the ordinary remedy was barred by limitations before it was filed, it was incumbent on the claimant to show that she had become the holder of it before the bar attached, and in the absence of such proof the claim ought to have been rejected. This note was not filed until five years after the bill was filed, and it is not shown when or how it came to her possession. It was incumbent upon her to show that she held the claim before the filing of the bill. 37 *Eng. C. L. Rep.*, 388, *Anderson vs. Weston.*

2nd. The deed of 1844 can be avoided only at the instance of antecedent creditors; subsequent creditors must wait until it is avoided before they can come in. 2 *Younge & Collyer*, 178, *Ede vs. Knowles.* 5 *Gill*, 449, *Worthington vs. Shipley.* 3 *Johns. Ch. Rep.*, 481, *Reade vs. Livingston.* 5 *Ves.*, 384, *Lush vs. Wilkinson.* 12 *Do.*, 147, *Kidney vs. Coussmaker.* 2 *Beavan*, 340, *Townsend vs. Westacott.* 1 *Md. Rep.*, 455, *Waters vs. Dashiell.* Here there was no attempt to execute the deed in anticipation of future creditors, because it was placed upon record as soon as executed, and as to the effect of enrolment as notice and as rebutting the inference of fraud, see 3 *Md. Ch. Dec.*, 174, *Cole vs. O'Neill.* But we say further, that the deed was not made with intent to delay, hinder or defraud this claimant, Truitt. On the contrary the answer, which in these respects is strictly responsive, denies fully every imputation of fraud, and affirms and vindicates the good faith of the entire transaction. Fraud is never to be *presumed*, but must be *proved;* strong suspicions will not be sufficient. 2 *Md. Rep.*, 374, *Faringer vs. Ramsay.* The effect of the answer must stand until disproved by one witness and pregnant circumstances; here it is neither *discredited* or *disproved* in any *material* averment. As to the effect of such an answer, see 3 *Md. Rep.*, 226, *Glenn vs. Grover.* 3 *G. & J.*, 433, *Roberts vs. Salisbury.* 6 *Do.*, 54, *Joice vs. Taylor.* 2 *Brown's Ch. Rep.*, 90, *Stephens vs. Olive.* 9 *Gill*, 236, *Powles vs. Dilley.*

The witness chiefly relied upon by the complainants, is Julia McGee, who acknowledges that she was, at the date of these transactions, boarding with Mrs. Osborne, and there supporting herself by open prostitution, and there is nothing to show that her manner of life is changed, and conceding that her depraved manner of life does not utterly disqualify her as a witness, it will subject all she urges to suspicion. And when she speaks, as in this case, of events which transpired years before, and in which she had no interest, and her statements are found to be evasive, inconsistent and contradictory, and are sustained by no collateral and well authenticated facts, her testimony is entitled to no credit whatever. It will be diffi-

cult to determine whether she means to refer her testimony to the mortgage of 1842, or to the deed of 1844. It is certain that on or before the year 1842, Mrs. Osborne was erecting costly improvements on her property, and furnishing it at great expense. And with the exception of a small sum of $78.12, claimed by Walter Crook, and some few others, secured by mortgage, it is not shown that she was indebted to any other person than Goldsmith in 1842. And it is shown, also, that in February 1844, she was under no sort of embarrassment or apprehension from her creditors.

As to the testimony of Spurrier: This testimony is fully and accurately stated in the report of the case in 2 *Md. Ch. Dec.*, 382. Mrs. Osborne goes to the conveyancer to make an *absolute* deed, and when there, states her own motives for making *such* a deed, and then her *anterior* agreement with Goldsmith. Now these declarations are sought to be sustained as admissible, 1st, on the ground of agency; 2nd, as part of the *res gestæ;* and 3rd, as part of the fraud. It is clear that they would not be admissible as between *her* and *Goldsmith*, and therefore they cannot be admissible as against her title. They can only be admissible against her as part of the fraud. This disposes of the first two grounds. It cannot be said that a grantor, sent to convey her own title, is an *agent* for the grantee to whom she is about to convey it. See 5 *Cushing*, 585. And was it ever heard of, that a declaration directly opposing the act, can be admitted to explain the act itself as part of the *res gestæ?* In the case in 5 *Day*, 341, the declarations were not made to the party who accepted the deed, and the case of *Barrett vs. French*, in 1 *Conn.*, 354, 365, shows that they could not be admitted to invalidate the title of the grantee for the benefit of the grantor or her creditors. See, also, 4 *Day*, 284, *Beach vs. Catlin*, and 1 *Stewart & Porter*, 317. But all that can be said of them is, that they illustrate *her* design; they do not show what was his *design*, and unless he was cognizant of the design which she entertained, there was no fraud in *him*, and it is essential, to vacate a deed as fraudulent as against creditors, under the

statute of 13th Elizabeth, that there should be a fraudulent intent in both the grantor and grantee. To admit declarations of the grantor, made out of the presence of the grantee, to invalidate the title of the latter, would be a precedent fraught with danger in the extreme. It would permit parties to fabri- cate testimony to avoid their own acts for their own benefit. We therefore say that these declarations were inadmissible here, as there is nothing to connect him with the design which she may have had.

Tuck, J., delivered the opinion of this court.

It is conceded that there is no question before us as to the deed of the 14th of July 1841.

Of all the creditors who offered proof of their claims, none was such prior to the 5th of November 1842, the date of the mortgage, except Walter Crook, Jr.; and if the plea of limita- tions can avail the defendant, none of them have a standing in court except Sarah Ann Truitt, whose claim can be enforced, if at all, only against the equity of redemption conveyed by the deed of the 16th of February 1844. The first question then to be disposed of relates to the plea of limitations, relied on by Goldsmith.

There are decisions to show that, in cases like the present, this defence has been rejected, but whether correctly or not we are not at liberty to inquire, because the point has been definitively settled in this State. The chancellor, after having discussed the question upon principle as well as authority, re- ferred to the case of The Farmers Bank vs. Mullikin, in this court, December term, 1840. We have carefully examined that record and the proceedings on the appeal, and find that it fully sustains the view taken here on behalf of the defend- ant below. The amended bill and answers distinctly raised the issue of fraud in fact. It was asserted that the deeds were made by contrivance and conspiracy between the parties, with intent and for the purpose of defrauding the complain- ants and other creditors of the grantor, and that that unlawful purpose would be accomplished if the deeds were allowed to

stand as valid, inasmuch as the grantor had no other property wherewith to satisfy his creditors. It appears by the minutes for the decree, taken down by the clerk of the court, and by the decree itself, that the deeds were "adjudged to have been made in fraud of the creditors of the grantor," and that the defence of limitations relied on in the answers of three of the defendants was sufficient to protect the interests of two of them; but that the benefit of that defence was denied to the other only because it had been waived by him. It was urged in argument there, as here, that the grantee should be treated as a trustee for the creditors, and as such, could not interpose this defence against those for whose use he held the property. This point is thus answered in the minutes for the decree: "Limitations will bar as to trusts created by operation of law, though it may not in express trusts." There being no difference between the cases, we must yield to its authority without reference to the decisions in other courts.

This view of the case disposes of all the claims except those of Truitt and relieves us from the necessity of passing upon the mortgage of the 5th of November 1842, there being on party in court in whose behalf it can be assailed. Moreover, we agree with the chancellor as to the effect of the proceedings in equity, under the act of 1833, ch. 181, as a protection to the defendant against inquiry, in this case, into the question of fraud in obtaining that deed.

The remaining questions on these appeals relate to Truitt's claims and the charge of fraud as to the deed of the 16th of February 1844. This complainant did not set out her cause of action in the bill of complaint, but subsequently filed two notes of Osborne under the commission to take proof, one for $1100, dated the 6th of November 1843, and another for $2800, dated the 21st of October 1844, which was not due when the bill was filed. We can express no opinion as to the last of these claims. The chancellor has neither allowed nor rejected it; but, on the contrary, has reserved it for further directions.

We think that her claim on the note for $1100 was properly allowed. It was signed by Osborne and endorsed by

43    v.6

Goldsmith, the payee. The objection is, that it does not appear that she held this note when the bill was filed, but we are of opinion that she must be regarded as the owner at that time until the contrary appears. She is described in the bill as a creditor, and at the proper time for proving her case she filed and proved this note under the commission. It does not appear when Goldsmith endorsed it, but the inference is that it was endorsed, if not on the day of its date, at least before its maturity. *Pinkerton vs. Bailey*, 8 *Wend.*, 600. *Anderson vs. Weston*, 37 *Eng. Com. Law Rep.*, 388. *Burck- myer vs. Whiteford*, 6 *Gill*, 1.

The decision of the question of fraud depends on the bill, answer and proofs. We might rather say on the proofs, as we do not attach much consequence to the answer. The evidence on the part of the creditors was assailed as general, contradictory, and unworthy of credit. This affirmation, we think, was more justly applied to the answer, for the contradictions are striking and irreconcilable, while the gross carelessness and want of system and precaution in large money transactions, which, according to the answer, appear to have signalized the defendant's habits of business, are calculated to impair the weight which an answer should have when furnishing no reason to suspect unfairness in the transactions of which it speaks. Concurring with the chancellor in what he has said respecting the case as disclosed by the answer, we proceed to consider the proofs; and, first, the admissibility of the declaration of Osborne, as proved by Spurrier and McGee.

It is a general and very salutary rule of evidence, that a party will not be permitted by his own declarations to defeat a prior deed; but it is also well settled, that in some cases the declarations and admissions of a grantor will be received where the effect may be to impair the title of persons claiming under him. *Dorsey vs. Dorsey*, 3 *H. & J.*, 410. *Walls vs. Hemsley*, 4 *H. & J.*, 243. 1 *Greenl. Ev.*, secs. 189, 190. Another principle is, that all such facts as have not been admitted by the party against whom they are offered, or by some one under whom he claims, ought to be proved under

solemn sanctions by persons having knowledge of the facts, but to this certain exceptions have also been recognized, some from very early times, on the ground of necessity or inconvenience; and among these is proof of the quality and intention of acts by evidence of declarations accompanying, or so nearly connected with them in point of time as will serve to explain their true character and purpose. We are informed by Professor Greenleaf, (*Vol.* 1, *sec.* 108,) that it is very difficult to bring this class of cases within the limits of a particular description. The points of attention are, whether the circumstances and declarations are cotemporaneous with the main fact, and whether they are so connected with it as to illustrate its character. Where a party does an act material to be understood, his declarations expressive of the character, motive or object of it are regarded as "verbal acts indicating a present purpose and intention." Their admissibility is to be determined according to the degree of their relation to the principal subject matter of dispute, in the exercise of a sound discretion by the court. The cases will show that they need not take place immediately with the occurrence of the act, but may be before and sometimes after, provided they be calculated to unfold the nature and quality of the facts they are intended to explain, and so to harmonize with them as to constitute one transaction. 1 *Greenl. Ev.*, *secs.* 108, 109, 110. *Broom's Maxims*, 442, (50 *Law Lib.*) 7 *A. & E.*, 384, (34 *Eng. C. L. Rep.*) *Kolb vs. Whitely*, 3 *G. & J.*, 188. *Cross vs. Black*, 9 *G. & J.*, 210. *Burckmyer & Adams, vs. Whiteford*, 6 *Gill*, 14. *Garner vs. Smith*, 7 *Gill*, 1. *Miller vs. State*, 8 *Gill*, 141. *Handy vs. Johnson*, 5 *Md. Rep.*, 450.

This doctrine has been applied in cases like this, in which the object was to vacate deeds at the instance of creditors. *Merrill vs. Meachum*, 5 *Day*, 341, cited by the chancellor, is clearly in point, where the declarations of the grantor, "tending to show that the deed was executed for the purpose of securing the land against the attachments of his creditors," were admitted. But the correctness of the principle had been questioned, if not denied, in *Beach vs. Catlin*, 4 *Day*, 284. The case of *Barrett vs. French*, 1 *Conn.*, 354, relied on by

the defendant, is not like the present. It does not appear that the declarations of the grantor were offered in evidence as part of the *res gestœ*.

In *Harshaw vs. Moore*, 12 *Iredell*, 247, where a deed was impeached for fraud as against creditors, the declarations of the grantor, immediately before and in contemplation of the act, were received to show his object in doing it, as strong evidence bearing upon the very point in issue against the party claiming under him. See also *Ford vs. Elliott*, 4 *Excheq. Rep.*, 78.

Cases like the present have also occurred in Maryland, in which the declarations of the grantor were introduced, to impeach the deeds. *Duvall vs. Waters*, 1 *Bland*, 588. *Birely vs. Staley*, 5 *G. & J.*, 432. *Strike vs. McDonald*, 2 *H. & G.*, 206. In the latter case one of the grantors was also examined for that purpose. The Court of Appeals did not pass upon the question, although the point was made. However, the chancellor in *Duvall vs. Waters*, appears to have relied on the grantor's declarations as evidence of the alleged fraud.

But there is a class of decisions in England, as well as here, so analogous that it seems to us they should be governed by the same rules of evidence. We allude to cases in bankruptcy, and those arising under our insolvent laws, in which deeds and transfers of property have been held to be good or bad, according to the intent of the party in making them. In both these classes of cases, the quality of the act depends upon the same principle. "In questions respecting acts of bankruptcy the intention is almost always the very point in issue, and this is commonly to be collected from the conversations importing the existence of those apprehensions which give a character and quality to the concomitant actions." 2 *Evans Pothier*, 247; *Appendix*, *No.* 16, *sec.* 11. 1 *Ph. Ev. Hearsay.* 3 *Gill & Johns.*, 188. In *Bateman vs. Bailey*, 5 *Term Rep.*, 512, a declaration of the debtor made the day after the act, was held admissible; and the established doctrine in England, now is, that the court will, in each case, consider whether the declaration proposed to be received does or does not come within a reasonable time of the disputed act. As, if the question arise, whether a security were given by way of fraudulent pre-

ference, the material inquiry will be, what was the situation, conduct, and language of the bankrupt with reference to the whole transaction? *Broom's Maxims*, 441. 9 *Bing.*, 352, 355. And this doctrine is fully recognized in *Kolb vs. White-ly*, 3 *Gill & Johns.*, 188, as applicable to cases under the insolvent laws. There, certain entries in the books of the insolvents, and the declarations of one of the firm, made a few days before the property was delivered to the appellant, were received to show that, at the time of the transfer, the parties contemplated becoming insolvent debtors. The rule stated is, that, "where it is necessary, in the course of a cause, to inquire into the nature of a particular act, and the intention of the persons who did the act, proof of what the person said at the time of doing it, is admissible evidence for the purpose of showing its true character." And "in general, where the evidence is offered as a mere fact which is connected with the matter in dispute, and not with a view to affect the party otherwise than as the actual existence of the fact affects the nature of the transaction itself, then, although it was a transaction between others, yet, as a mere fact, and part of the *res gestœ* it is evidence." We do not understand the court as having admitted the evidence, as might be inferred from the last clause of the opinion, because there was no reason for supposing that the insolvent had made the declarations under sinister motives, or as having designed to qualify the general rule announced; but rather as using those remarks in answer to the argument of the appellant's counsel. It is true, that generally the declarations of a party under whom another claims, are received, when made against his own interest, and at a time when he had no motive to misrepresent the truth; but we apprehend that the doctrine of *res gestœ* is not governed by this principle. Greenleaf states the general rule, *sec.*, 109, but he adds, "no reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the declarant's title, or otherwise qualifying his possession, if made in good faith, should not be recieved as part of the *res gestœ;* leaving its effect to be governed by other rules of evidence." Indeed, such declarations are admissible in some cases, where the party

has a manifest interest at the time, as where an entry is made to take advantage of a forfeiture, to defeat a disseizin or to foreclose a mortgage, or the like. *Green. Ev.*, *sec.* 108. For the same reason, in actions by bailor against bailee, for loss by negligence, the declarations of the latter, cotemporaneous with the loss, were held to be admissible in his favor, to show the nature of the loss. *Story on Bailments, sec.,* 339. The explanations or admissions of bankrupts, are received, no matter in whose favor they may operate in the suit in which they are offered; but we have not found a case in which the question of their admissibility was determined with reference to any supposed considerations of interest of the debtor, at the time of making them. If they may fairly be regarded as resulting from the cotemporary motives acting on his mind and influencing his conduct, they may be received. 2 *Ev. Poth.*, 248.

Several cases have occurred in this court under the insolvent laws. It appears, by the record in *Dulaney vs. Hoffman,* 7 *Gill & Johns.*, 170, that one of the insolvents was examined, and his declarations were also offered in evidence, to show that the assignment was fraudulent in view of these laws, and the case was decided on this proof. In *Hickley vs. Farmers and Merchants Bank*, 5 *G. & J.*, 377, and in *Davis vs. Beatty,* 9 *Gill*, 211, the grantors were examined; and in *Powles vs. Dilly*, 9 *Gill*, 229, the conversations and declarations of the debtor were received, to show the true character of the acts alleged to be void as against creditors. The court held, that the declarations and conversations, (though occurring some time before,) were part of the *res gestæ*, concomitant with the principal act, and served to explain the motives and circumstances surrounding the assignment. The transfer was, also assailed as void under the statute of Elizabeth.

If, as in the three cases last cited, the declarations or evidence of the debtor may be invoked as proof of an honest purpose, why may not the party who denies the validity of the act, resort to the same source for evidence of his intent, when the act is done with an illegal purpose? The rule being, that wherever the nature and quality of the act depends on the intent of the parties, cotemporaneous statements may be taken to

show the intent, there appears to be no stronger reason for receiving such evidence in one case than in the other.

The same doctrine has been applied to assignments under the act of 1829, ch. 51. In *Crawford vs. Brooke*, 4 *Gill*, 213, the assignor of a *chose in action* was called by the defendant in an action by the assignees, to show that he had made the assignment for the purpose of qualifying himself as a witness to establish the claim, and to take it without the statute of limitations, by proving a promise on the part of the debtor within three years. His testimony was admitted, because an assignment so made could not be regarded as *bona fide* within the meaning of the act of 1829, and was liable to be assailed on the ground of the fraudulent character of the transaction, and that the assignor was a competent witness to discover the motives that governed him in making the transfer.

Under the statute of *Elizabeth*, the insolvent laws, and the act of 1829, ch. 51, transfers of property or *choses in action*, are void or not, according to the intent of the parties, in view of their provisions respectively. If the grantor or assignor may be called, or his declarations given in evidence, to impeach his own act, in cases within these acts of Assembly, there is not perceived any reason for excluding them when offered to ascertain his motive in a transaction denounced as fraudulent under the statute. The doctrine, that "in questions of fraud or *bona fides* an adequate judgment can, in general, only be formed by having a perfect view of the whole transaction, which, of course, includes the conversation which forms a part of it, and, according to the phrase usually applied to this subject, the language which is used on any occasion forms a part of the *res gestæ*," (2 *Ev. Poth.*, 247,) equally applies to this, as any other case of fraud; and upon the authorities, as well as analogies of the law, we feel warranted in receiving the declarations of Osborne, made before the execution of this deed, as given in evidence.

It was argued that there is danger in admitting such proof, because of the temptations it holds out to grantors to arm themselves, in advance, with testimony, by making such

declarations as will defeat their own act. All rules of evidence are liable to abuse, and not unfrequently fail to accomplish their real object, the ascertainment of the truth. The objection, however, cannot apply here. It must be observed that in cases like the present the grantor is bound by the deed, and has no interest in setting it aside. What does not go to the creditors remains in the grantee. The declarations or explanations made at the time of the act cannot avail the grantor in any controversy between him and his grantee, involving the title. As between them the deed is conclusive, except it be different in terms from that which the parties intended it should be. In which cases relief is granted on the ground of accident, mistake or fraud. But as to strangers assailing the deed the principle is different. 4 *Gill*, 220. This case is not varied by Osborne's statement of an agreement on the part of the defendant to execute a writing for the reconveyance of the property. If this was really so the fraud is established. On the other hand we cannot assume that the sale was *bona fide* on the part of Goldsmith, and that she made the declarations for the purpose of fabricating testimony for the recovery of the property, without ascribing to her a degree of ignorance that the law does not impute to any one, for she knew, in legal contemplation, that her own statement, that such an agreement existed, could not have that effect. In addition to this, the declarations, when admitted, do not *per se* establish the fraud as against the grantee. They are only part of the case, to be considered in connection with the rest, and to be governed as to their *effect by other rules* of evidence. Fraud shrouds itself in mystery. Parties may seek to protect themselves by various subterfuges and pretences, which it is impossible to detect and expose by direct evidence, though when all the circumstances are combined and considered together, they may be such as to show that both parties to the deed were influenced by the same illegal purpose.

Upon a careful consideration "of all the facts and circumstances of the case, and drawing such inferences as a jury

might reasonably make," (5 *Gill & Johns.*, 450,) we think there cannot be a well founded doubt that the parties to this deed designed to hinder and delay the creditors of the grantor. Independently of the suspicion that surrounded the dealings between them, as disclosed by the answer itself, the evidence shows that Osborne was under great apprehensions lest her creditors would press for settlements and take her property; and that this fear was excited by Goldsmith; and that he advised the transfer to him as the only means of saving her property. He informed Spurrier that she would call and give directions about a deed, and her declarations made at that time, when the fraud was in course of being perpetrated, (9 *Gill & Johns.*, 211,) show that this was her understanding of the transaction. We cannot exclude the testimony of these witnesses. Spurrier is not impeached, nor is McGee's veracity directly assailed. Some portions of her evidence may be inconsistent with other portions, but the whole is not to be rejected on this account alone. In narrating transactions long past the memory of a witness may be at fault as to some particulars, and be correct as to others, and especially where they were such as the witness had no reason to suppose he would be called on to explain afterwards. She had no interest in misstating the transactions between Osborne and Goldsmith, nor any motive, as far as we can discover, for testifying on one side rather than on the other. In the main points of the case, bearing on the question of fraud, she is corroborated by other proof in the record. It is urged that she should be discredited because she states the deed to have been executed in January 1841, when it bears date in February 1844. But she does not state this positively; she expresses her belief of the time, and though in error as to the date of the transaction she may remember that it occurred, and recollect the principal facts connected with it. The question is, whether the circumstances stated by her took place with this particular instrument? The interrogatories on both sides and her answers relate to the deed of 1844. She speaks of declarations and acts of the parties in connection with a deed executed, when

certain creditors, (the complainants among them,) were demanding payment of their claims. It so happens that these complainants were creditors in 1844, and not in 1841 or 1842, when the other deeds were executed, and this is shown, not by this witness, but by their causes of action. The identity of this instrument, as the one referred to by her, is also sustained by its relation in point of time to the declarations of Osborne, as proved by Spurrier, and to the period of her removal to New York, which occurred in the year 1844.

It may be that the defendant paid his money as a consideration for this deed; but we cannot believe, from the whole case, that it was a *bona fide* purchase, and not designed to defraud the creditors of the grantor. If it was actual and *bona fide*, and Goldsmith cannot explain the transaction in the face of the evidence offered by the creditors, it was his error, if not fault, to have carried on for a number of years large dealings with an illiterate woman, without the guards and precautions generally observed in business with such persons, as well for his own protection as hers. Upon the whole case we think the decree of the chancellor was correct and must be affirmed on both appeals, and that the case should be sent to the circuit court of Baltimore city to carry the same into effect.

*Decree affirmed and cause remanded.*

ECCLESTON, J., dissented in part, and delivered the following opinion:

The deed of the 14th of July 1841, is not now in controversy.

I concur with the chancellor in his views respecting the mortgage deed dated the 5th of November 1842, and the decree passed by Baltimore county court for a sale of the mortgaged property, and therefore unite with my brethren in affirming so much of the chancellor's decree as dismisses the bill, without prejudice, in regard to the deed of 1841 and the mortgage of 1842. But I do not concur with the majority of this court in the propriety of affirming that portion of the decree which vacates the deed bearing date the 21st of October 1844.