CHARLES CROOK, JR., and others, *vs.* HENRIETTA R. GLENN, and others.

*Presumption in aid of Title—Adverse possession by a Mortgagee and his Representatives, and Lapse of Time will bar an application for a Cancellation of the Mortgage—Statute of Limitations.*

Where possession of land is shown to have existed for a great length of time without interruption, all those circumstances or formal ceremonies which the law deems necessary to make such possession rightful, will be supplied by presumption, and the possession thus supported will not be disturbed.

An exclusive adverse possession for more than twenty years by a mortgagee and those claiming under him, without any account or acknowledgment of a subsisting mortgage, is a complete bar to an application for a surrender and cancellation of the mortgage and a delivery of the possession of the mortgaged premises.

The statute of limitations applies to trust estates.

Where there is a trustee in existence to represent the *cestui que trust* and her rights and interest in the trust estate, the statute of limitations bars as effectually as if there existed no disability in the *cestui que trust*.

APPEAL from the Circuit Court of Baltimore City.

The bill in this case was filed on the 27th of May, 1864, by the children of Mrs. Mary Ann Crook, against the heirs of the late Judge John Glenn, to obtain a decree for the surrender and cancellation of a mortgage from Mrs. Crook and her husband Charles Crook, Sr., to the said Glenn, and the delivery of possession of the mortgagee' premises. The bill alleged that Mrs. Crook and her husband, on the 21st day of November, 1834, united in a mortgage to the said Glenn, of certain real estate in the city of Baltimore, held to her sole and separate use, to secure the sum of twenty thousand dollars, which her husband had contracted to pay to the said Glenn for certain other property in said city; that soon after the husband took possession of the property so sold to him for

twenty thousand dollars, and put large improvements thereon and otherwise increased its value; but about six months afterwards, in the year 1835, and before the first payment became due, he gave up the purchase with the consent of Glenn, and returned the property, enhanced in value; that the said Glenn held and enjoyed this property from that time to the period of his death in 1853, and the same had been held since by his legal representatives. The bill further charged that if the mortgage was ever of any validity, it was annulled and abrogated by the surrender of the property, to secure the purchase money of which, the mortgage had been given; but that said Glenn sometime after the execution of the mortgage obtained possession of the mortgaged premises, and notwithstanding the abrogation of the arrangement aforesaid, had held said property up to the time of his death, and his heirs and representatives had held the same ever since; that Mrs. Crook died in April, 1864, intestate and without having made any appointment of said property after her decease, and that thereby the same was vested in the complainants; that the said Glenn departed this life in 1853, leaving a widow and children. The answer admitted the death of Judge Glenn, in the summer of 1853, and that he left a widow and children, who were entitled to his estate under the provisions of his will—it also admitted the execution of the mortgage. The answer then charged that the said Glenn had executed to Mrs. Crook and her husband, a bond of conveyance of even date with the mortgage, of the property, to secure the purchase money of which the mortgage had been executed, for a consideration of $20,000 on long time, or $16,000 at shorter dates—that the property thereby contracted to be conveyed, was purchased for and was to be conveyed to the sole and separate use of Mrs. Crook, with power of disposition by deed or will, and in default of such disposition, then to the use of her children, the said uses being precisely the same as those to which the mortgaged property aforesaid was held, so that the said mortgage instead

of being a pledge of the separate estate of Mrs. Crook, as security for a debt or contract of her husband, as by the bill of complaint would appear, was in fact given for the separate benefit of Mrs. Crook herself, who was joint obligee in the bond of conveyance; that the said Glenn, as shown by the bond of conveyance, had previously, on the 4th of December, 1830, executed to the President and Directors of the Union Bank of Maryland, a mortgage of the premises contracted to be conveyed to said Crook and wife, for the sum of $23,700; that there was also pending before Baltimore County Court in equity, a bill for the sale of the same premises, in satisfaction of a previous mortgage executed to John R. Wier and others, which had already passed to decree. The answer charged that under this decree, the said Glenn had already as trustee, on the 10th of November, 1830, sold the said premises, and the purchaser having failed to comply with the terms of sale, an order of re-sale had been passed; that said Glenn, in addition to his being the trustee under the said proceedings, had also become assignee of the mortgage claim of John R. Wier, complainant, and on the 11th day of November, 1830, by the payment of $10,860.66, had become the assignee of a mortgage upon the same premises from the executors of B. J. Von Kapff, deceased, and by further payment on the same day, of $14,268.55, had become the assignee of another mortgage upon the same, from James Wilson and Thomas Wilson, which said last named mortgages were prior in date to the mortgage to Wier and others, upon which the decree aforesaid had been rendered. The answer further represented that by virtue of the liens upon said property thus acquired, as well as of other small claims against the same, amounting in all to largely more than the value for which the said Glenn contracted, by his bond aforesaid, to convey the same to Crook and wife, viz: $20,000, and by virtue of his appointment as trustee in equity, the said Glenn having a control of the interests and proceedings aforesaid, and being willing to allow the said Crook and wife

to become the owners of said property in which said Crook had been previously interested, entered into the said bond of conveyance, and thereby gave to the said Crook and wife, the privilege of discharging the purchase money, ($20,000, by payment of $16,000,) in the manner in the said bond provided; but the said Glenn being indebted as aforesaid to the Union Bank of Maryland, in the large amount of money which he had borrowed for the purpose of buying in the mortgage claims aforesaid, (as will appear by the fact that the mortgage to the bank was executed on the same day on which the assignments above mentioned were recorded, to wit, the 4th of December, 1830,) and having already sustained the loss which the consideration mentioned in the bond of conveyance established, was unwilling to rely altogether for the purchase money upon the premises sold, &c., required the additional security of the mortgage. It was further alleged that the necessity for this security was soon made apparent by the fact that none of the provisions of the said purchase were complied with by the said Crook or his wife, and the said Glenn, after having renewed his indebtedness to the Union Bank by giving additional security, was finally compelled to pay the same out of his own moneys, on the 15th of January, 1846. The answer further showed that previously thereto, to wit, on the 21st of August, 1839, the said Glenn and the President and Directors of the Union Bank of Maryland, filed their bill on the equity side of Baltimore County Court against the said Crook and wife, and others, for the foreclosure of the very mortgage set forth in the bill in this case, under which proceedings a decree for the sale of the said mortgaged premises was rendered in favor of the complainants on the 11th day of March, 1844; that the said decree does not appear by the record to have been executed by the sale of the said mortgaged premises, but the same is relied on as conclusive against the pretensions set up in the bill in this case, and as disposing of the rights which the complainants assumed to have been protected against lapse of time, by reason of the

coverture of Mrs. Crook, who was competent to bind, and did in fact fully bind the whole estate in the said mortgaged premises, by her mortgage aforesaid. The respondents further averred and charged, that after the lapse of so many years and the decease of their testator, it was impossible for them to say at what time the premises claimed by the bill, or those to secure the purchase money whereof, the mortgage filed with the bill was executed, passed into the possession of their testator, but they were satisfied and therefore charged, that the same had been in the possession of their testator and of these respondents, adversely and under claim of right for more than twenty years prior to the institution of the proceedings in this case; they had every reason to believe, and therefore charged that such possession was acquired by their testator, and continued in him with the full consent of said Crook and wife, and as a partial indemnification for the very heavy sacrifices which their said testator had made by way of advances to and on account of the said Charles Crook, and in order to relieve him and his family under the embarrassments growing out of his repeated failures in business. The respondents further charged that the mortgaged premises referred to in the bill in this case, together with the property mentioned in the bond of conveyance, did not together amount in value, by reason of depreciation after the transactions in controversy to the purchase money for the payment of which the bond of conveyance provided, and offered to deliver possession of the two said pieces of property to the complainants, and account for the rents and profits thereof from the time that it passed into the possession of their testator, upon being paid the purchase money, $20,000, in the bond of conveyance recited, with interest, and reimbursement for taxes, repairs, and other necessary expenses by them and their testator incurred.

The respondents positively denied that there was any abrogation whatever of the contract of sale and mortgage, by means whereof it was ever intended that the mortgaged

property should be released from the operation of the mortgage, on the contrary, the proceedings and decree for the foreclosure of the same, established conclusively, that said Glenn insisted upon, and said Crook and wife did not dispute the continuing force and obligation of the said mortgage.

The respondents relied upon the said decree, and upon the satisfaction by their testator to the Union Bank of Maryland, of the mortgage to said bank for $23,700, together with adverse possession, and the lapse of time since said possession began, and said decree of foreclosure was rendered.

It was in proof that Crook put improvements on the property, embraced in the bond of conveyance while he had it in possession, and that in 1852, Mr. Glenn received some $6,200 for losses by fire, on the premises; and further, that in October, 1842, Judge Glenn had offered the mortgaged premises and the property sold, both together, to Crook for $12,500, but he declined to take it for sundry reasons assigned. There was also in evidence a copy of a bond of conveyance, dated the 16th day of October, 1826, from Stewart Brown and Mary Lancaster, to Charles Crook, of the same premises, which were subsequently mortgaged by said Crook and wife to Judge Glenn; the objects and purposes of this bond of conveyance will be found sufficiently set out in the opinion of this Court. On the 30th of March, 1867, the Court (ALEXANDER, J.,) passed an order dismissing the bill with costs. From this order the complainants appealed.

The cause was argued before BARTOL, C. J., NELSON, STEWART, MILLER and ALVEY, J.

*Jervis Spencer*, for the appellants:

The mortgage being necessarily extinguished by the giving up of the sale and purchase and the debt, for the security of which it was given; and Mrs. Crook not being liable for the debts of her husband, there was nothing for the mortgage to secure. It was satisfied. And Mrs. Crook could not convey

the property in any other way or for any other purpose, except as the law provides. *Chaney, et ux. vs. Tipton, et ux., et al.,* 3 *Gill,* 334; *Steffey vs. Steffey,* 19 *Md.,* 11; *Johns vs. Reardon and Wife,* 11 *Md.,* 469.

Neither Mrs. Crook nor her heirs are barred by lapse of time. 1 *Story's Eq. Pl.,* 503; *Hansford and Wife vs. Elliott,* 9 *Leigh,* 79, 95; *Sledges' Adm'rs, et al. vs. Clopton,* 6 *Ala.,* 589, 595, 604, 605; *Tate, Adm'r, &c. vs. Greenlee,* 2 *Hawks,* (*N. C.,*) 486, 487; *Eschbach vs. Pitts,* 6 *Md.,* 77, 78; *Demarest and Wife vs. Winkoop, &c.,* 3 *Johns. Ch. Rep.,* 135; *Knight and Wife vs. Brawner,* 14 *Md.,* 1; *Dugan, et al. vs. Gittings, et al.,* 3 *Gill,* 159, 160.

The decree from which this appeal was taken was certainly wrong in dismissing the bill, inasmuch as the defendants in their answer offered to account; and it should have been retained for this purpose.

*T. Wallis Blakistone* and *W. M. Merrick,* for the appellees:

Mrs. Crook, by the terms of the trust, had the absolute disposition of the mortgaged premises, and the right, of course, to encumber them by the mortgage, which was for full value. Having executed the mortgage, reserving possession till default, and having surrendered possession on default, and for nearly thirty years allowed Glenn to retain possession without any attempt to redeem, she and her trustee are as effectually barred redemption as if she had executed a deed of the equity jointly with her husband. *Price & Nesbit vs. Bigham's Ex'rs,* 7 *H. & J.,* 298, 318; *Tiernan vs. Poor,* 1 *G. & J.,* 216, 227; *Brundige vs. Poor,* 2 *G. & J.,* 12; *Croxall vs. Shererd,* 5 *Wallace, S. C.,* 268, 282, 289; *Doe vs. Oliver,* 10 *Barn. & Cress.,* 181; *Inman vs. Barnes,* 2 *Gallison,* 315; *Wright vs. Scott,* 4 *Wash. C. C.,* 24.

This not being a proceeding on behalf of the married woman for an account and redemption, or in any wise for her benefit, her disabilities cannot be set up by parties not claiming under her, nor indeed could the doctrine of a

married woman's freedom from estoppel be applied, in any event, to a case where, having the powers of a *feme sole,* she performed or allowed acts within her powers which would have estopped a *feme sole.*

Limitations run against trustees and *cestuis que trust,* on one side and strangers on the other. *Hill on Trustees,* 503; *Hovenden vs. Lord Annesley,* 2 *Schoales & Lefroy,* 628, 629.

The decree in the County Court is a bar to the relief here prayed, it being only competent for the parties to review it in that Court, if there be cause. Mrs. Crook and her husband having the right to mortgage, were sufficient parties defendant to the proceeding for the foreclosure of the mortgage, and a decree against them bars the remaindermen through them. *McDowell vs. Goldsmith,* 6 *Md.,* 319; *Clagett and Hill vs. Hall,* 9 *G. & J.,* 93; *Dorne vs. Catlett,* 6 *H. & J.,* 483; *The Tide Water Canal Co. vs. Archer,* 9 *G. & J.,* 525; 4 *Kent,* 268, *top; Nash vs. Spofford & Wife,* 10 *Metcalf,* 192.

ALVEY, J., delivered the opinion of the Court.

To fully understand the rights and relations of the parties, it is first important to examine the bond of conveyance from Brown and Lancaster, to Charles Crook, executed in the year 1826.

By the recitals of that bond, it appears that, for the consideration of $1,214, to be paid out of the separate funds of Mrs. Crook, the wife of the obligee in the bond, the obligors agreed to convey the estate bargained for, to Charles Crook and his heirs, *in trust* for Mrs. Crook, the wife, as therein mentioned. That but a portion of the purchase money was paid at the time of the execution of the bond, and for the balance the individual promissory notes of Charles Crook were passed, and upon the payment of which, the conveyance was to be made. The trusts, declared in the condition of the bond, upon which the estate was to be conveyed, were, that Charles Crook, the obligee, and his heirs, should hold the property in

trust for Mrs. Crook, for and during her life, with power to her to dispose of the same absolutely by deed, contract or will, and in case of the non-exercise of such power, then in trust for her children, by her then husband, equally, as tenants in common thereof. When or how the balance of the purchase money was paid, does not appear; nor does it appear that there was ever a deed made in pursuance of the bond. Crook and wife, however, were let into the enjoyment of the property, and remained therein until 1834, when Crook contracted with the late Judge Glenn for the purchase of certain other property on French street, in the city of Baltimore, for the sum of $20,000, on long time, or $16,000, at shorter dates. And for the conveyance of this last mentioned property, when the purchase money should be paid, Mr. Glenn executed to Charles Crook and wife, a bond of conveyance, wherein he obligated himself to convey the property to Crook, as trustee for his wife, and the trusts declared therein were the same as those set out in the bond of conveyance from Brown and Lancaster, before stated. This bond of Glenn was dated the 21st of November, 1834; and, of the same date therewith, Crook and wife executed to Glenn a mortgage of the equitable estate held by them in the property for which the bond from Brown and Lancaster was taken, to secure the payment of the purchase money for the property purchased of Glenn.

By the bond an option was given the obligees to discharge the whole amount of purchase money, by the payment of $20,000 in instalments payable at certain times, or by payment of $16,000, if paid at shorter periods. And, by the mortgage, it was stipulated, that, until default made, the mortgagors should retain possession; and the first instalment, under an election to take advantage of the longest credit, was due the 20th of September, 1835; the interest on the whole sum remaining due to be paid quarter-yearly, dating from the 20th of September, 1834. Judge Glenn died in the year 1853, and Mrs. Crook in 1864.

It is not alleged, or pretended, that any portion of the pur-
chase money, thus secured, has ever been paid to Mr. Glenn,
or to his representatives. But sometime after the date of the
bond and mortgage, Glenn became possessed of both the mort-
gaged property, and the property for which he had given his
bond to convey; and such possession, which is still held by
the heirs of Glenn, has given rise to this proceeding and liti-
gation.

The bill was filed on the 27th of May, 1864, by the chil-
dren of Mrs. Crook, who were to take after her death, in the
event that she did not dispose of the estate in her lifetime,
against the heirs of Mr. Glenn, to obtain a decree for the
surrender and cancellation of the mortgage, and the delivery
of possession of the mortgaged premises. The gravamen of
the bill upon which the decree is sought to be founded, is,
that after the execution of the mortgage, and the taking
possession of the property purchased of Glenn by Crook,
the latter "put large improvements thereon, and otherwise
increased the value of the same; *but, about six months after-
wards,* in the year 1835, and before the first payment became
due, he gave up the purchase, with the consent of said Glenn,
and returned the property to said Glenn, when it was more
valuable than when it went into the hands of the said Charles
Crook; and the said Glenn held and enjoyed the same from
that time to the period of his death, in 1853, and the same
has been since held by his legal representatives." And it is
further alleged, "that if the said mortgage was ever of any
validity, by the return of said property, and giving up the
sale and purchase for twenty thousand dollars, the mortgage,
that had been given to secure the said sum, was also annulled
and abrogated; but the said John Glenn, *sometime* after the
execution of the mortgage, *got possession* of the said mort-
gaged premises, and notwithstanding the abrogation of the
arrangement aforesaid, and return to him of the property he
had undertaken to sell, he has held both of said properties
ever since, and his heirs and representatives, being in posses-

sion, now claim to hold the said property by virtue of said mortgage."

It will be observed, that neither the time when, nor the circumstances, or understanding, under which the possession was obtained by Glenn, of the mortgaged property, are alleged with any degree of certainty; nor are they more satisfactorily shewn by the evidence. The defendants, by their answer, positively deny that there ever was any abrogation whatever of the contract of sale and mortgage, by means whereof it was ever intended that the mortgaged property should be released from the operation of such mortgage; but, on the contrary, aver and insist that certain proceedings that were had, and which terminated in a decree for the foreclosure of the mortgage, establish conclusively, that Glenn insisted upon, and that Crook and wife did not dispute the continuing force and obligation of such mortgage. The proceedings referred to were instituted by Glenn, and the Union Bank, in Baltimore County Court, against Crook and wife, and others, in 1839, and the decree was passed in 1844. The decree, however, appears to have been lost, and its terms and character are not shewn. The defendants, in their answer, rely, as defence, upon this decree; and they also rely upon adverse possession, of more than twenty years; and upon the great lapse of time before claim made by the present bill.

Upon this state of case, two questions arise: First, whether the mortgage contract was, in point of fact, ever abrogated and annulled; and Secondly, if so, whether the adverse possession and lapse of time form a bar to the relief sought by the present proceedings.

1. At what precise time, or under what particular circumstances, the property mortgaged passed into the possession of Mr. Glenn, does not appear; but as there was a covenant for possession by the mortgagors until default made, and default occurred on and after the 20th of September, 1835, we may presume, in the absence of definite evidence upon the subject, that Glenn took possession after that time. Mr. Charles

Crook himself was examined as a witness by the appellants, and the only account that he has given, of this change in the possession of the property, is, that "Mr. Glenn got it about the time the mortgage was executed; he took possession; he owned the property adjoining it; has retained the same; the rents were collected by Mr. Glenn, or his agents. It is in the possession of his family the same as it was in his lifetime." This is the whole of the witness' account of the manner of Mr. Glenn's getting possession. But was the mortgage vacated by an agreement between the parties? Crook swears that he gave up the factory property to Glenn, but he cannot recollect the year in which it was done, nor does he detail the circumstances of the transaction. And when asked whether, when the factory was given up by him, the transaction, as to the purchase of it, was at an end, he answers, "yes; I considered so." Thus plainly showing that there was not in fact any definite understanding between the parties upon the subject; for if so, why not relate it, when his mind was so directly called to the matter, and the proof of which was deemed of such importance to the success of the case? How, or in what light, Mr. Glenn considered the matter, or upon what terms or conditions he dealt with the subject, is not disclosed, otherwise than by inference. Crook admits that he never paid any part of the mortgage debt; and he says that he was never called on for payment. But, in this latter statement, he must be mistaken, for we find that, in 1839, in addition to the demand made by the proceedings to foreclose, to which he was a party, and duly summoned to appear, an action of covenant, on the mortgage, was brought for the $20,000, the mortgage debt, and that Crook appeared to the action. That Mr. Glenn did not agree to surrender the mortgage at the time stated by Crook, and that it was not his intention to abrogate and annul it, we think is clear, whatever understanding Crook himself may have had of the matter. The action of covenant, which remained on the docket until September, 1845, and the proceedings to foreclose the mort-

Crook, *et al. vs.* Glenn, *et al.*

gage, and which terminated in a decree in 1844, were all instituted after the time when Crook says the mortgage contract was abrogated; and, to the fact that such abrogation had taken place, it would be difficult to reconcile the subsequent conduct of either Glenn or Crook, in reference to these proceedings. And in this connection the letter of Crook to Glenn, dated the 31st October, 1842, is pregnant evidence to show that Glenn was then in possession of the premises, under claim of right, and that Crook was willing to negotiate with him in regard to the property, not only upon the assumption that he, Glenn, was rightfully in possession of it, but that he had the exclusive right to dispose of it. If this be so, to what was such rightful possession referrible, unless it be the mortgage executed in 1834? There is no sufficient evidence in the cause to support any other hypothesis. The *onus* is upon the appellants, and a failure to make out their case fully and clearly must result in their defeat. No presumption can be indulged against the rightfulness of such possession as is shewn here; on the contrary, all presumptions are indulged in its favor. In this case nearly thirty years were allowed to elapse before the possession of Mr. Glenn, and those claiming under him, was attempted to be brought into question; and as time naturally operates to obscure all human evidence, and to deprive parties, thus called upon to vindicate the integrity of transactions remote in the past, of the legitimate and appropriate means of verifying their true character, the lapse of time must be allowed to give rise to a presumption of innocence, and against any imputation of wrong. And so solicitous is the law, and especially when administered by a Court of Equity, for the repose of titles and the quiet of possessions, that when possession of land is shewn to have existed, as in this case, for a great length of time, without interruption, all those circumstances or formal ceremonies which the law deems necessary to make such possession rightful, will be supplied by presumption; and the possession thus supported will not be disturbed. *Knight vs. Adamson*, 2 *Freem.*, 106; *Lyford*

Crook, *et al. vs.* Glenn, *et al.*

*vs. Coward*, 1 *Verm.*, 195. To no case could such presumption be more properly applied than to the present.

We might stop here, and affirm the decree of the Court below; but we propose to examine briefly the second question, which we think equally conclusive against the appellants as the first.

2. Then, as to the second question, whether such adverse possession as is shown to have existed, constitutes a bar to the relief sought. And, in regard to the possession of the premises, whatever uncertainty may exist in other respects, there is no question but that they were in the exclusive adverse possession of Mr. Glenn, and those representing him, for a period of more than twenty years before this suit was instituted. This is shown by Crook, and also by Hart, a witness examined on the part of the appellants. Indeed, it is plainly admitted by the allegations of the bill. As matter of fact, therefore, it is not in issue. The question is as to the legal consequence of the fact thus plainly appearing.

And in discussing this question of adverse possession, as a bar to the relief prayed, we must bear in mind, that by the bond of conveyance from Brown and Lancaster, before referred to, Charles Crook was sole obligee, and by the declaration of trust therein, was sole trustee for his wife and children. He occupied the position, therefore, not only to assert the legal remedies on the bond, as purchaser of the property in question, but, as trustee, became the proper party to protect and defend it against all adverse claims that might be made thereto. Such was the relation that Crook bore to the property in controversy, at the time and since the date of the mortgage to Glenn.

That it was competent to Mrs. Crook and her husband to make the mortgage, we do not understand to be controverted. The wife's general power to dispose of the estate absolutely, included the power to incumber it by mortgage, though it be for the debts of her husband. The cases of *Price & Nisbet vs. Bigham's Ex'rs.*, 7 *H. & John.*, 296, and *Demarest & Wife vs.*

*Wynkoop*, 3 *John. Ch. Rep.*, 129, are full and conclusive upon the subject. The relation of mortgagor and mortgagee, therefore, existed between the parties, and all the consequences that grow out of that relation must ensue. That length of time may be relied on, in bar of redemption, seems now to be too well established to be made a question. The contract of mortgage is of a peculiar nature, and by which, " under certain conditions, the mortgagee becomes the purchaser of a security and pledge, to hold for his own use and benefit. He acquires a distinct and independent beneficial interest in the estate; he has always a qualified and limited right, and may eventually acquire an absolute and permanent one to take possession, and he is entitled to enforce his rights by adverse suit *in invitum* against the mortgagor; all which can never take place between trustee and *cestui que trust.*" *Cholmondelay vs. Clinton,* 2 *Jac. & Walk.,* 183. And, in the same opinion from which we have just quoted, it is said that a " trustee is stopped in equity from dispossessing his *cestui que trust,* because such dispossession would be a breach of trust. A mortgagee cannot be stopped, because in him it is no breach of trust, but in strict conformity to his contract, which would be directly violated by any impediment thrown in the way of the exercise of this right. Upon the same principle the mortgagee is not prevented, but assisted in equity, when he has recourse to a proceeding, which is not only to obtain the possession, but the absolute title to the estate, by foreclosure. This presents no resemblance to the character of a trustee, but to a character directly opposite. It is in this opposite character that he accounts for the rents when in possession, and when he is not, receives the interest of his mortgage debt." And again, in the course of the same discussion, the learned Judge said: " The possession is all along consistent with the equitable title of the mortgagor, who may be disabled by poverty and distress, to enforce the account and redemption. Yet such is the prevalence of analogy in equity. that even under such circumstances, the possession of the

mortgagee for twenty years, without a recognition of the mortgage title, or any account kept upon the footing of it, becomes a subject of equitable bar to redemption, notwithstanding a clear title to redemption in the one party, and on the other side a continued misapplication of the rents and profits of the estate committed to his care, contrary to his engagement, and a continued breach of duty from the beginning to the end of the period, in omitting to keep the account." And that twenty years possession by a mortgagee, without any account or acknowledgment of a subsisting mortgage, is a complete bar to all equity of redemption, is also expressly decided by Chancellor KENT, in the case, before referred to, of *Demarest & Wife vs. Wynkoop.* Indeed, there is no authority to be found to maintain the contrary. It may therefore be regarded as completely established that such is the doctrine in a Court of Equity, in analogy to the bar to the right of entry, in a Court of Law.

In this case, however, the bill is not filed for redemption, but is for a cancellation of the mortgage, and a surrender of the premises; and if upon a bill to redeem, the adverse possession, as we have seen, would form a bar to relief, *a fortiori* will it bar relief on the present application. The bill states the possession to have been considerably more than twenty years, and assumes it to have been adverse to the parties entitled, from the time of the alleged surrender and abandonment of the contract of purchase of the factory property, which is supposed to have been in 1835 or 1836. Upon this statement and assumption of the bill, if true, the bar, by analogy, to the relief sought, is complete and conclusive, unless there be something in the case to relieve it from the operation of the lapse of time. And it is supposed, that because the property in controversy was trust property, or because there was a trust connected with it, for the benefit of Mrs. Crook and her children, therefore the statutory bar, by analogy, does not apply. It is true, that formerly an opinion prevailed, that trusts estates were not within the statutes of

limitation; but since the decision of Lord HARDWICK, in the case of *Llewellin vs. Mackworth,* stated in the note to 15 *Vin. Abr.,* 125, *pl.* 1, the question has been regarded as settled otherwise, and upon what has been received as very sufficient ground. In that case, the Lord Chancellor said: " The rule in this Court, (a Court of Equity,) that the statute of limitations does not bar a trust estate, holds only as between *cestui que trust* and trustee, and not between *cestui que trust* and trustee on the one side, and strangers on the other ; for that would be to make the statute of no force at all, because there is hardly an estate of consequence in the kingdom without such trust; and so the act would never take place. Therefore, where a *cestui que trust* and his trustee, are both out of possession for the time limited, the party in possession has a good bar against them both." And in the more recent case of *Bond vs. Hopkins,* 1 *Sch. & Lefr.,* 429, it was observed, by Lord REDESDALE, that if the equitable title be not sued upon within the time within which a legal title of the same nature ought to be sued upon to prevent the bar created by the statute, the Court, acting by analogy to the statute, will not relieve. If the party be guilty of such *laches* in prosecuting his equitable title, as would bar him if his title were solely at law, he will be barred in equity.

But it has been contended that because the *cestui que trust,* having a life estate in the property, was a *feme covert,* and therefore under disability to sue, she was not affected by the running of the statute of limitations ; and that as her children, taking in remainder, could not sue until the termination of the preceding life estate, the defence of adverse possession cannot be allowed to prevail against them.

This position would be very tenable if there had not been a competent person in existence all the while as trustee, to represent the *cestuis que trust,* and their rights and interests in the estate. Where such is the case, the statute bars as effectually as if there existed no disability in the *cestui que trust.* It was so decided by Lord Chancellor TALBOT, in

the case of *Wych vs. East India Co.*, 3 *P. Wms.*, 309, and that decision has ever since been regarded as law. It was there said that though the *cestui que trust* was an infant, yet he must be bound by the trustee's failure to sue in time ; for the benefit of the statute could not be taken from the defendants, not being in default, since their witnesses might die, or their vouchers be lost. And as to the trust, that was only between the trustee and the infant, and could not affect the defendants.

The reasoning of that case applies with full force to this ; and though it was a case in which the rights of an infant were concerned, still, the principle of it is equally applicable to the case of a *feme covert.* The trustee being competent, and having the right to sue, but failed to do so, and allowed a period of time to elapse greater than that prescribed for limiting the right of entry at law in cases of legal title, without any recognition of the rights of the *cestuis que trust* on the part of those holding the possession, the bar was complete at the time of the institution of this suit ; and, if the right were otherwise clear, this defence of lapse of time would be fatal to the claim of the appellants.

We shall therefore affirm the decree dismissing the bill, but without costs to the appellees.

*Decree affirmed.*

(Decided 18th January, 1869.)

STEWART, J., delivered the following dissenting opinion:

Regretting to differ, in some respects with my brethren, in the view they have taken of the merits of this case, I deem it proper to record my dissent, with a brief statement of the considerations that have affected my judgment.

Whilst I do not accord in the conclusions as to the facts and the law applicable thereto, under the first question presented in the opinion of the Court, I much more differ in the results under the second. There is no doubt the law is well established, that limitation operates as a bar to relief in equity

as well as at law, the Courts having adopted the provisions of the statute by construction and analogy—that limitation applies to trust as well as to legal estates—that although it does not operate between trustee and *cestui que trust;* with trustee and *cestui que trust* on the one side, and strangers on the other, it will operate—that the equitable interest, dependant upon the legal estate, in a trustee, may be divested by the disseizin of a stranger *who has no notice of the trust,* and the rights of the *cestui que trust* may be barred by the same acts as deny recovery to the trustee holding the legal estate. I do not understand the authorities as carrying the principle of construction to such extent as to conclude, by the *laches* of the trustee, the equitable rights of the *cestui que trust,* who is under *disability from infancy, coverture or otherwise,* especially where the trust and the disability are known to the claimant.

That although in the case of a mortgage the equity of redemption may be barred by lapse of time, the possession of the mortgagee, claiming to hold adversely, can give him no greater rights than a stranger or disseizor holding possession. In this case the fact of Mrs. Crook and her husband, the one *cestui que trust* the other trustee, having by an authorized mode executed the mortgage to Mr. Glenn, which she was competent to make in that form and which was binding upon her by reason thereof, ought not to affect her interest beyond the legal scope and effect of that instrument. Her disability as a *feme covert* prevents limitation from issuing against her during its continuance; and Mr. Glenn, who had notice of the trust estate and the equitable interest of Mrs. Crook, the *cestui que trust* therein, was entitled to no right against her from adverse possession. It by no means follows, because he was rightfully in possession as mortgagee under conveyance from her as well as her husband, and by her consent in default of payment of the mortgage debt, that his possession however long continued during her coverture, although not accounting with the trustee for rents and profits, could operate to establish a title in him in the same manner and to the same extent

as if Mrs. Crook was under no disability. Such an application of the analogies of the statute, it seems to me, is not in consonance with the first exceptions and savings provided for therein, and must occasionally result in great injustice to persons under disability, without commensurate general advantages. Infants, insane persons, *feme coverts*, whose rights are saved by the provisions of the statute under such a view, are excluded from the benefit of its reservations and a harsher interpretation given to it by Courts of Equity, than its express provisions warrant in a Court of Law. Such a construction virtually abrogates the savings of the statute, whilst it rigorously enforces its other provisions. See *Allen vs. Lloyd*, 2 *Verm.*, 368.

From the character of this case I do not perceive that there has been any *laches* on the part of the complainants in the prompt assertion of their rights, after the death of their ancestor Sarah Ann Crook. Limitation relied upon by the respondents as a bar to recovery, ought not to be allowed, because the disability of Sarah Ann Crook as a *feme covert*, protected her against such defense. In the absence of a foreclosure of the mortgage, the fact of the return, acceptance and re-possession of the factory property by Mr. Glenn, the ancestor of the respondents, the conveyance of which property to Crook, as trustee for his wife, was the consideration of the mortgage and to secure the payment of which the same was given, and the filing of the bill to foreclose the said mortgage, and the discontinuance of any further proceedings thereon, the institution of the suit at law for the recovery of the mortgage debt and its abandonment, with the entry, " off with costs," 2d September, 1845, are facts sustaining the theory of a waiver or some abrogation of the security of the mortgage, in the absence of any satisfactory proof to the contrary. The mortgage from Crook and wife under such circumstances, should be treated as void and inoperative to affect the rights of Sarah Ann Crook. The property embraced therein should be released therefrom and restored to the complainants, together with

any rents and profits received by the respondents since the death of Sarah Ann Crook. The decree below ought to be reversed and the cause remanded for proper proceedings, in conformity with such views of the equity of the parties.