(Decided 13th January, 1880.)

---

## WILLIAM H. WEAVER vs. GEORGE W. LEIMAN.

*Statute of Limitations—Bill in Equity for an Account— Demand in Equity by Cestui que trust of an Account from Trustee—Statute of Limitations as applicable to Implied or Constructive Trusts—Petitioner for the benefit of the Insolvent Laws—Petitioner not actually Insolvent—Who entitled to Surplus remaining after payment of Debts—When Limitations are in favor of a Stranger to a Trust—Effect of a party's Intrusion upon an Infant's estate—What does not affect the running of the Statute of Limitations—Entries in a Family Bible or Testament as Evidence—When entries in the Baptismal Register of a Church made by the Clergyman, are admissible in Evidence.*

Weaver *vs.* Leiman.

As a general rule the Statute of Limitations is a bar to a bill in equity for an account, just as it is a bar to an action of account in a Court of law.

Where there is an express, subsisting and recognized trust, and the *cestui que trust* demands in equity an account from the trustee, neither the period of limitation prescribed by Statute, nor length of time is a bar to relief.

But where there is merely an implied or constructive trust arising by operation of law, Courts of equity, as a general rule, will follow and obey the law by applying the statutory limitation of time.

The fact that a petitioner for the benefit of the insolvent laws is not actually insolvent, does not affect the validity of his discharge, nor oust the jurisdiction of the Insolvent Court.

In such case the surplus remaining in the hands of the trustee, after payment of debts, belongs to the insolvent by way of resulting trust, and is not held by the trustee under any *express trust* for the benefit of the petitioner.

Where there is a trustee competent to sue and protect the trust estate, limitations run in favor of a *stranger* to the trust, notwithstanding the *cestui que trust* may be an infant.

A party intruding upon an infant's estate becomes constructively his guardian or trustee, but against such a trust limitations run; and to avoid the bar, the bill for account must be filed within three years after the infant arrives at age.

Mere doubt as to the right, or difficulty in the way of its assertion will not affect the running of the Statute; apart from the disabilities expressed in the Statute itself, there must, in order to prevent its operation, be some insuperable barrier, or some certain and well defined exception clearly established by judicial authority.

Entries in a family Bible or Testament are *admissible* in evidence even without proof that they have been made by a parent or a relative.

But such entries are not in all cases *conclusive* of the facts stated; their weight as evidence is subject to be weakened or strengthened by all the proof in reference to them.

Who made the entries, when they were made, and whether the book has been so kept as to be accessible at all times, to all the members of the family, are all matters to be considered in determining the *probative force* of such entries.

Entries in the baptismal register of a church made by the clergyman in the regular discharge of his clerical duties, are admissible in evidence, after his death, though there is no law requiring such records to be kept.

Ordinarily such entries are admissible only for the purpose of proving the fact and date of baptism, and not of other matters therein stated, such as the date of the birth of the child.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ROBINSON and IRVING, J.

*Geo. Hawkins Williams*, for the appellant.

*John N. Steele* and *Albert Ritchie*, for the appellee.

MILLER, J., delivered the opinion of the Court.

Litigation in various forms respecting certain property which originally belonged to Conrad Leiman, has been before this Court on former occasions. By agreement, the records in those cases have been made evidence in this, and a brief statement of some of the prominent facts they disclose, is necessary to a proper understanding of the present controversy.

In September, 1852, Leiman conveyed certain leasehold property in Baltimore City, improved by several houses, to Harman Schafferman, and in May, 1854, applied for the benefit of the insolvent laws, returning in his schedule no property. William Seip was appointed his trustee, and he obtained his final discharge in due course in September, 1854. After this, in January, 1857, Schafferman re-conveyed the property to Leiman by a deed which was withheld from record until June, 1860. In March, 1860, before this deed was recorded, Schafferman sold and con-

veyed the property to William H. Weaver, who there-upon entered into possession, and, as is alleged, received the rents and profits thereof, until June, 1868. In May, 1861, more than a year after the conveyance to Weaver, Leiman, for the consideration of one dime, conveyed all his estate in the property to his son, George W. Leiman, the present complainant, who was then an infant, under the age of twenty-one years, and it is upon the title acquired by this deed that he has filed the bill in this case.

Having thus given the conveyances according to their dates, we must recur to the litigation, pending which most of them were executed. In December, 1857, one of the creditors of Leiman, (Seip, the trustee, in insolvency, having refused to do so,) filed a bill in equity to set aside the deed of September, 1852, from Leiman to Schafferman, as fraudulent and void as against the creditors of the gran-tor. Upon this bill a long litigation ensued, and the conveyance was finally condemned as fraudulent by the judgment of this Court in April, 1868, (*Schafferman vs. O'Brien,* 28 *Md.,* 565,) and the property directed to be sold. Two days after this decision was rendered, William H. Dawson was appointed trustee by the Insolvent Court in place of Seip, who had previously died. The new trustee proceeded at once to sell the property, and sold the same on the 15th of June, 1868, for $4500. The money having been brought into Court for distribution, numerous credi-tors presented their claims, and various questions there-upon arose, which were settled by this Court in the case of *The Insolvent Estate of Conrad Leiman,* 32 *Md.,* 225, the opinion in which was delivered in March, 1870. One of the questions presented in that case was, who had title to the surplus of the fund, if there should be any, after payment of creditors? Weaver claimed it under his deed from Schafferman of March, 1860, and George W. Leiman claimed it under the deed from his father of May, 1861. The Court held that Weaver had knowledge

in fact, of the prior unrecorded deed of January, 1857, from Schafferman to Leiman, and was not therefore a *bona fide* purchaser without notice; and accordingly decided that George W. Leiman was entitled to such surplus. The case was then remanded with directions for an account to be stated, distributing the fund in accordance with the views of the Court expressed in that opinion. Upon the remanding, further exceptions were taken to the allowance of several claims and the case again came up, and was decided by this Court in an opinion which is not reported. Being again remanded, a further account was stated. Then still further exceptions were taken to certain claims and they were disallowed. Finally, an account was stated showing a small surplus, and this account, after another appeal which was dismissed, was eventually ratified, and in December, 1871, this surplus was paid over to George W. Leiman, in accordance with the decision in 32 *Md.*, 225. Having thus briefly stated the previous litigation and its results, we are prepared to consider the case now before us.

The bill was filed on the 27th of April, 1872, after the whole proceeds of sale of this property had been thus disposed of under the proceedings in insolvency. It was filed by George W. Leiman, who bases his claim and right to sue, upon the deed to him from his father, Conrad Leiman, of May, 1861. The defendants are Weaver, and Dawson, the trustee in insolvency, but it is not pretended that any relief can be had against the latter, and it is admitted he was a mere nominal, if not an unnecessary, party. We shall therefore treat the case as if it were a proceeding against Weaver alone.

The bill charges that Weaver had possession of this property from March, 1860, until June, 1868, and during that period, received and enjoyed the rents and profits therefrom, amounting in the aggregate, as complainant believes, to some five or six thousand dollars or more, and

that during the whole of this period complainant was a minor under age, and not competent to assert or protect his rights; that he is advised he has a just claim against Weaver for the amount of the rents and profits he so received, from the date of complainant's deed of May, 1861, or, that but for his wilful neglect or default might have been so received; and the bill prays that an account may be taken of the rents and profits received by Weaver during his possession of the premises from May, 1861. In his answer, Weaver, after denying that the complainant is entitled to an account, pleads the Statute of Limitations as a full and complete bar to the suit; and by a special replication to this plea, the complainant avers that when the cause of complaint and right of action accrued, he was an infant under the age of twenty-one years, and that the suit was instituted within *three years* next after he arrived at the age of twenty-one. Most of the testimony in the case relates to the age of the complainant, but before considering it, some preliminary questions must be disposed of.

Without attempting a review of the authorities, or the reasons on which they are founded, it is safe to state that the following propositions are clearly established:

1st. As a general rule the Statute of Limitations is a bar to a bill in equity for an account, just as it is a bar to an action of account in a Court of law, *Wilhelm vs. Caylor, Ex'r of Riael,* 32 *Md.,* 151 ; *McKaig vs. Hebb and Brengle, Ex'rs of Booze,* 42 *Md.,* 227.

2nd. But if a *cestui que trust* demands in equity an account from the trustee, and there is an express, subsisting, and recognized trust, neither the period of limitations prescribed by Statute, nor length of time, is a bar to relief. 32 *Md.,* 239 ; *Lewin on Trusts and Trustees,* 612 ; *Hovenden vs. Lord Annesley,* 2 *Sch. & Lef.,* 633 ; *Needles, et al. vs. Martin,* 33 *Md.,* 619.

3rd. If however there is merely an implied or constructive trust, arising by operation of law, Courts of equity

will, as a general rule, follow and obey the law by apply-
ing the statutory limitation of time. *McDowell vs. Gold-
smith,* 6 *Md.,* 337; 2 *Md. Ch. Dec.,* 391; 32 *Md.,* 240; 2
*Perry on Trusts, sec.* 865.

We fail to discover in the present case any express
trust which prevents the operation of the Statute upon
the complainant's claim. It was decided in the insol-
vency case (32 *Md.,* 225) that there was an express trust
as between the trustee and the creditors, which would
prevent the running of the Statute as against *their*
claims, but it was not decided, nor even intimated, that
there was any such trust, as between the trustee and the
complainant, who claimed the surplus remaining after
creditors had been paid, as assignee of the insolvent. It
was simply declared that he *had title* to such surplus and
it was afterwards paid to him. Looking to the scope and
purpose of the insolvent laws it is plain, they neither
provide nor contemplate that the trustee shall become a
trustee for the benefit of the insolvent himself or his
assignee. True it is, that upon his appointment and giving
bond, title to all the insolvent's property is immediately
vested in the trustee, but he holds that property, and is
bound to administer it, for the benefit of creditors only.

That is the duty which the law requires, and that is
the sole trust it creates and reposes in him. The fact
however, that a petitioner is not actually insolvent, does
not affect the validity of his discharge, nor oust the juris-
diction of the Insolvent Court. The surplus remaining
in the hands of the trustee, after payment of debts,
simply belongs to the insolvent by way of a resulting
trust, and the Insolvent Court will direct it to be paid to
him. *Buckey vs. Culler,* 18 *Md.,* 432. But whether in
the present case the trustee holding, as he undoubtedly
did, the title to this property, had the right, and the exclu-
sive right, to sue for and collect these rents and profits,
is a very different and much more difficult question. But

according to the view we have taken of the case, that question need not be decided. If the right of action for these rents was in the trustee alone, then he was competent to sue for them and protect the trust estate. Not having done so, (or at least not effectually) it is very clear that limitations had run and become a bar in favor of Weaver, the possessor of the premises and a stranger to the trust, notwithstanding the complainant may have been a *cestui que trust* under the disability of infancy. *Crook vs. Glenn,* 30 *Md.,* 55; 2 *Perry on Trusts, sec.* 858; *Wych vs. East India Co.,* 3 *Peere Wm's.,* 309. To meet this objection the complainant must take the position that the right of action was vested in him, and the case will be disposed of upon the *assumption* that it was so vested.

At the time the complainant's title accrued under the deed of May, 1861, he was unquestionably an infant and remained so for some years thereafter. Hence it is argued that Weaver became an intruder upon an infant's estate, and it is said that whoever enters upon the estate of an infant will be considered in equity as guardian for such infant, who may after his majority recover the rents and profits by a bill in equity, and if the person entering, continues the possession after the infant comes of age equity will decree an account against him as guardian, and carry on such account after the infancy is determined. *Drury vs. Conner,* 1 *H. & G.,* 230. This, without doubt, is a well settled and most salutary principle, and it is cited as well to sustain the jurisdiction in equity, as to affect the operation of the Statute of Limitations. There is some force in the objection on the other side, that Weaver cannot be regarded as entering or intruding upon the infant's estate, inasmuch as he derived title, and went into possession of these premises more than a year before the infant acquired his title to them. But waiving this, and conceding he was such intruder, what is the result? Simply that he thereby became *constructively* a guardian or

trustee of the infant. All the authorities concede this, and, as we have shown, against such a *constructive trust*, limitations will run. To avoid the bar of the Statute, the bill must be filed within three years after the infant arrives at age. This was done in *Drury vs. Conner*, 1 *H. & G.*, 220, and hence no question of limitations arose in that case.

But apart from infancy and the existence of a trust, various reasons why the plea should not prevail in this case have been relied on, and it is insisted : 1st. That the Statute did not begin to run against the complainant until the insolvent trust was completed in January, 1872, because until then, or shortly before, it was uncertain whether there would be a surplus or not : 2nd. That at most it did not begin to run until March, 1870, when the question of title to the surplus, as between Weaver, and the complainant was settled by the decision of this Court : 3rd. That through all the previous litigation Dawson, the trustee, was acting as attorney for Weaver, and doing all in his power to protect him from this very claim for rents and profits : 4th. That when the trustee did, in July, 1870, at the request of the complainant and upon his giving him a bond of indemnity for costs, file a bill to collect these rents. Weaver in his answer set up, *inter alia,* the defence that the trustee had funds enough, and that suit against him could only be maintained by the party entitled to the surplus, and that suit was afterwards dismissed.

No doubt the complainant might, and probably would, have encountered some embarrassment and difficulty in the assertion of his claim at a much earlier period, but an examination of the records in the previous cases, as well as in this, has satisfied us that the objections stated, are not entitled to as much weight as has been ascribed to them by his counsel in argument. It is not stated for what reason the bill filed by Dawson was dismissed, but,

as we understand the agreement of counsel in the present record, it was dismissed by the complainant himself, on the 10th of May, 1872. He, in fact, instituted that suit in the name of Dawson, and then dismissed it after he had filed the present bill in his own name. It was, therefore, his own fault if he sustained any harm, either by the institution or dismissal of that suit. It was competent for Weaver to set up all the defences he could to that bill, and it is quite clear, that by asserting in his answer to that suit, that he was liable only to the party entitled to the surplus, he is not estopped from pleading limitations to this. Then as to the acts and conduct of Dawson. In the insolvent case, Weaver, in opposition to the complainant, who was represented by able counsel, claimed the surplus proceeds of the sale of the property then in the hands of the trustee, and also filed a claim as creditor of the insolvent. Dawson appears to have acted, with other counsel, for Weaver in the assertion of these claims, and this is all these records show he did, except to allow his name to be used by the complainant in filing the bill of July, 1870. In all this we discover nothing to justify the inference that there was any collusion between Dawson and Weaver to defeat the complainant's claim to these rents and profits, or to hinder or delay him in instituting a suit therefor in his own name. Finally the insolvent proceedings show, that the property was sold by the trustee, on the 15th of June, 1868, and, as it was purchased by a third party, we infer that Weaver was then turned out of possession. It was sold for $4500, and the amount of debts returned by the insolvent upon his application, in May, 1854, was only $1329. It was therefore, quite apparent, at that time, that it would not require the additional sum of $5000, or $6000, to be derived from the collection of these rents, to pay the debts of the insolvent in full, principal and interest. The complainant could have safely brought his suit

immediately after this sale, even if it would have been difficult for him to have asserted his rights before.

In short, we find nothing in any, or all of these objections combined, to affect the running of limitations. Mere doubt as to the right, or difficulty in the way of its assertion, will not do. Apart from the savings and disabilities expressed in the Statute itself, there must, in order to defeat its operation, be some insuperable barrier, or some certain and well defined exception clearly established by judicial authority. In *Green vs. Johnson,* 3 *G. & J.,* 394, the Court expressed in very strong terms its disapproval of all attempts to remove the safeguards, and fritter away the provisions, of this most important Statute, by judicial refinements and subtile exceptions, or to increase the number of interpolations or constructive innovations that have already been engrafted upon it.

The remaining, and main inquiry is, was the bill filed within three years after the disability of infancy was removed? It was filed on the 27th of April, 1872, and the question therefore, is, whether the complainant was, or was not twenty-one years old, prior to the 27th day of April, 1869? He relies upon the testimony of his mother, and the entries in the family Bible. The mother was examined in February, 1877. Her own age is not stated, but it appears she was the mother of seven children, that George, the complainant, was her second child, and that her husband, Conrad Leiman, died in May, 1868. In her examination-in-chief, she testified quite positively, that her son George would be twenty-nine years of age, the 20th of June next, that is, on the 20th June, 1877. This would make his minority terminate on the 20th of June, 1869, and save the bill by *one month and twenty-four days.* On cross-examination, however, she displays the usual infirmity of memory as to dates, and that too, as to the exact dates of events quite as important to her, and just as likely to be borne in remembrance, as that of the

birth of her second child. She could not tell when she was married, nor, with certainty, when any of her other children, except the two eldest, were born. Being asked how she was able to remember the date of George's birth, and whether she had refreshed her memory on this point, and if so, how? her reply is, "I remember his birth; I know what day he was born; *I have got it put down in a book at home, a German Bible.*" This Bible was afterwards produced before the commissioner, but it does not appear from the record to have been thus produced *upon the call* of the cross-examining counsel, so as to make it evidence offered by the defendant. The book itself is not before us, but the entries on the fly-leaf, stating the dates when six of the children were respectively born, have been copied into the record by agreement.

The authorities show that entries in a family Bible or Testament are *admissible* in evidence even without proof that they have been made by a parent or a relative; for as this book is the ordinary register of families, and is usually accessible to all its members, the presumption is that the whole family have more or less adopted the entries contained in it, and thereby given them authenticity. 1 *Taylor's Ev.*, sec. 585 ; *Hubback's Evidence of Succession,* 672. This Court has said, when the book is once shown to be the family Bible or Testament, the entries therein derive their *weight* as evidence not more from the fact that they were made by any particular person, than that being in that place as a family registry they are to be taken as assented to by those in whose custody the book has been kept. *Jones vs. Jones,* 45 *Md.,* 144. It is certain, however, that such a registry is not, in all cases, *conclusive* of the facts stated, but its weight as evidence is subject to be weakened or strengthened by all the proof in reference to it. The party by whom the entries were made, when they were made, whether the book has been so kept as to be accessible at all times to all the members of the family,

are all matters to be considered in determining the *proba-tive force* of such evidence. On all these points the testimony of the mother is very important. While she states that this Bible was bought by her husband, had been in the family twenty or thirty .years, and that the entries therein were according to her knowledge of the facts, she admits they were not made by her husband, but by some one who could write English. She does not know *when* they were made but thinks they were *all written at one time*. During her husband's life he kept the book up stairs, sometimes in a table, and sometimes in a bureau in his own bed-room, and since his death she has kept it in her bureau. Now if these entries were all made at one time, it is apparent upon their face that the entry as to the birth of George must have been made more than *twelve*, and that of the eldest child more than *fifteen* years after the dates of their respective births as therein recorded. Again, there is no record whatever of the birth and death of an infant who was next to the youngest of the children. These facts, if they are not sufficient to exclude these entries altogether, and render them inadmissible in evidence (a point that need not be decided) must greatly weaken, if not destroy their weight and force.

Against this proof the defendant has produced entries of the *baptisms* of the two eldest children and of the *marriage* of their parents, taken from the records of Zion Church, a German Lutheran Church in the City of Baltimore. These entries are in the form of certificates by the Rev. H. Scheib, certifying that he performed the several ceremonies therein stated. There was no law requiring such records to be kept, but we are clearly of opinion they are admissible in evidence, and it has been so decided by unquestioned authority. In the case of *Kennedy vs. Doyle,* 10 *Allen,* 161, where the issue was, the infancy *vel non* of the defendant at the time the contract sued on was

made, the question was elaborately considered, and it was there decided that the entry of the baptism of the defendant, made by a Roman Catholic priest, in the discharge of his ecclesiastical duties, is competent evidence, after his death, of the date of baptism, if the book is produced from the proper custody, although he was not a sworn officer, and there was no law requiring such a record to be kept. In *Blackburn vs. Crawford,* 3 *Wallace,* 175, the Supreme Court decided that a similar entry in the baptismal register of St. Patrick's Church in the city of Washington, was admissible to prove the fact and date of the baptism of the child, upon the ground that the entries in the register were made by the writer in the ordinary course of his business. Such entries, however, are ordinarily admissible only for the purpose of proving the fact and date of baptism, and of no other matters therein stated, such for instance as the date of the birth of the child, because the fact and date of baptism are the only facts necessarily within the knowledge of the party making the entry. The principle upon which these entries are admitted for such purpose, is the same which governs the admission of entries after his death by a clerk, agent, attorney or other disinterested person, made in the regular course of business, and when he had no interest in stating an untruth. *Reynolds vs. Manning,* 15 *Md.,* 510; *Romer vs. Jaecksch,* 39 *Md.,* 588. As was said in *Kennedy vs. Doyle,* "an entry made in the performance of a religious duty is certainly of no less value than one made by a clerk, messenger or notary, an attorney or solicitor, or a physician, in the course of his secular occupation." In the cases referred to the priests who made the entries were dead at the time they were offered in evidence, and the same authority, (10 *Allen,* 165,) shows that had the priest been still alive, the records would not have been admissible in evidence *"unsupported by his testimony."* Here the Rev. Mr. Scheib, the clergyman who performed

these ceremonies, was alive and was not examined as a witness. But the agreement of counsel, as we understand it, supplies the requisite support of his testimony. By that agreement "the marriage and baptismal certificates furnished by the Rev. H. Scheib, are admitted, as if proved under the commission *by him*—all this subject to all just exception—that is to say, that the *contents* of the certificates furnished, are truly *extracted from the church records*, to have the same effect as if regularly proved as such extracts under the commission, and that Scheib now is, and then was, the pastor of said church, *and was the officiating clergyman at the ceremonies he so certifies to.*" We think it is plain that the purpose, as well as the effect of this agreement was, to dispense with the calling of this clergyman to prove that he performed these ceremonies at the respective dates stated, and made contemporaneous entries thereof in the church records, in the due course of his clerical duties, and to admit that such were the facts. Besides this, the mother testifies that she was married, and that these two children were baptized by the Rev. Mr. Scheib.

These entries or certificates must therefore be received as evidence, and it is very clear that entries thus made at the time by a clergyman in the regular discharge of his duty, are far more reliable, and entitled to much greater weight than the imperfect recollection of the mother as to dates, supported as it is only by the entries in the Bible, which we have shown were made many years after the events. In fact, there is little ground for supposing they are not absolutely correct as to the dates of the ceremonies thus recorded. Now what do they show on their face, and in connection with the testimony of the mother? They show that the complainant was baptized on the 29th of October, 1848, and the mother says, that at the time he was baptized, she believes he was about two years old, and *"knows that he was walking about;"* and again she is *"quite*

*certain"* her second child was born within three years after her marriage, and the marriage certificate shows she was married in the year 1843. From these facts the conclusion is irresistible that the complainant was twenty-one years of age prior to the 27th of April, 1869. But the utter inaccuracy of the entries in the Bible is demonstrated by the fact that the baptismal certificate shows that Emma, the eldest child, was baptized on the 15th of September, 1844, while the entry in the Bible states that she was born on the 15th of June, 1845. In this state of proof the Court is bound to reject the inaccurate entries in the Bible, and the defective memory of the mother, and to rely upon the proof afforded by the baptismal and marriage certificates, in connection with the testimony of the mother as to facts about which she could not well have been mistaken. We therefore determine that the plea of Limitations is a bar to this suit.

It was also proved that in September, 1866, the complainant appeared before the Register of Voters in the District of Anne Arundel County, in which he then resided, and in accordance with the provisions of the Registration Act of 1865, ch. 174, made oath that he was, or would be twenty-one years of age at the then ensuing November election. It also appears from the record in the insolvent case, that he was examined as a witness on the 9th of January, 1869, and swore that he was then twenty-one years of age. But we concede that very little credit, even if he is competent so to testify, can be given to an affidavit of a party himself, as to his own age, made at or about the period when he is supposed to have attained the age he swears to. Apart, however, from these affidavits, which may possibly tend to support the conclusion we have reached, the other proof to which we have adverted is quite sufficient, and we rest our decision upon that.

The result is, that the decree appealed from, which directs the defendant Weaver to account with the com-

plainant, of and concerning the rents and profits of this property, must be reversed and the bill dismissed.

*Decree reversed, and*
*bill dismissed.*

(Decided 28th January, 1880.)